1  SCHIFF HARDIN LLP
Jean-Paul P. Cart (SBN 267516)
2  jcart@schiffhardin.com
One Market
3  Spear Street Tower, Suite 3100
San Francisco, CA  94105
4  Telephone:     415.901.8700
Facsimile:     415.901.8701
5

6  Matthew F. Prewitt (*pro hac vice*)
mprewitt@schiffhardin.com
Michael K. Molzberger (*pro hac vice*)
7  mmolzberger@schiffhardin.com
233 South Wacker Drive, Suite 7100
8  Chicago, IL 60606
Telephone: 312.258.5500
9  Facsimile: 312.258.5600

10  Attorneys for Plaintiffs
BUNNETT & COMPANY, INC. and ENERGY
11  FEEDS INTERNATIONAL, LLC

12                    UNITED STATES DISTRICT COURT

13                   NORTHERN DISTRICT OF CALIFORNIA

14

15
   BUNNETT & COMPANY, INC. and              Case No.  3:17-cv-01475-RS
16  ENERGY FEEDS INTERNATIONAL,
   LLC,                                     **THIRD AMENDED COMPLAINT**
17
                   Plaintiffs,              **DEMAND FOR JURY TRIAL**
18
   v.
19
   J.D. HEISKELL HOLDINGS, LLC,
20  TODD GEARHEART, E&K AG, LLC,
   FRANK DORES, RAY GEARHEART,
21  AND GEARHEART AG CONSULTING,
   INC.,
22
                   Defendants.
23

24

25

26        Plaintiffs Bunnett & Company, Inc. and Energy Feeds International, LLC for their Third

27  Amended Complaint against J.D. Heiskell Holdings, LLC, Todd Gearheart, E&K Ag, LLC, Frank

28

Dores, Ray Gearheart, and Gearheart AG Consulting, Inc., state as follows.[1]

**<u>PARTIES</u>**

1.     Plaintiff Bunnett & Company, Inc. ("Bunnett & Company") is a Delaware corporation with its principal place of business in Travis County, Texas.  Bunnett & Company is a distributor of nutritional supplements for dairy cows, including sodium bicarbonate and other minerals.

2.     Plaintiff Energy Feeds International, LLC ("Energy Feeds") is a Delaware limited liability company with its principal place of business in San Leandro, California.  Energy Feeds is also a distributor of nutritional supplements for dairy cows, primarily distributing a type of supplement known as "inert fats" or "bypass fats."  Both Bunnett & Company and Energy Feeds were founded and are led by William E. Bunnett ("William Bunnett").  William Bunnett is the sole shareholder of Bunnett & Company and the sole member of Energy Feeds.  Mr. Bunnett is a citizen and resident of the State of Texas.

3.     Defendant J.D. Heiskell Holdings, LLC, d/b/a JD Heiskell & Co. ("J.D. Heiskell") is a California limited liability company with its principal place of business in Tulare, California.  J.D. Heiskell purports to be among the top trading companies in the United States and is the country's fourth largest animal feed manufacturing company by volume.  A substantial portion of J.D. Heiskell's revenues are from the sale of nutritional supplements for dairy cows.  Historically, J.D. Heiskell has purchased a large volume of products from both Bunnett & Company and Energy Feeds.

4.     Defendant Todd Gearheart is an individual residing in Twin Falls, Idaho, and a citizen of Idaho.  Mr. Todd Gearheart is a Vice President of J.D. Heiskell.  He manages J.D. Heiskell's Northwest Business Group, which is also referred to by those in the industry as "JDH-Idaho."

---

[1] Plaintiffs have attached hereto a chronology of supporting documents.  By virtue of the extensive deposition and trial testimony in certain related proceedings, there is an extensive evidentiary record supporting the allegations of this Complaint.  The further discovery that the Bunnett Parties require in this matter to be ready to proceed to trial is focused principally upon J.D. Heiskell, who has participated in the prior proceedings only as a non-party discovery respondent.

5.      Defendant E&K Ag, LLC ("E&K Ag") is an Idaho limited liability company with its principal place of business in Twin Falls, Idaho. Todd Gearheart and his father, Ray Gearheart, are the sole members of E&K Ag.

6.      Defendant Frank Dores ("Dores") is an individual residing in Atwater, California, and a citizen of California.  Dores is the former General Manager of both Bunnett & Company and Energy Feeds.  He resigned from the Bunnett Parties' employ on October 23, 2015.

7.      Defendant Ray Gearheart is an individual residing in Grass Valley, California, and a citizen of the state of California.  He is a former sales representative for Bunnett & Company and Energy Feeds.  After his resignation, he became a sales representative for Agrofin, Inc., selling Wawasan products in the western United States.

8.      Defendant Gearheart Ag Consulting, Inc. ("Gearheart Ag") is a California corporation with its principal place of business in Grass Valley, California.  On information and belief, Ray Gearheart is the sole shareholder of Gearheart Ag.  Ray Gearheart conducts his business operations through Gearheart Ag.  Todd Gearheart and Ray Gearheart are referred to collectively hereinafter as the "Gearhearts."

**FORMER DEFENDANTS**

9.      Wawasan Agrolipids SDN BHD ("Wawasan") is a company incorporated in Malaysia with it principal place of business in Johor, Malaysia and is engaged in the business of manufacturing various types of specialty feed fats for dairy cows, including inert fats. Historically, Wawasan had been Energy Feeds' exclusive supplier of inert fats.  Energy Feeds was Wawasan's single largest customer, prior to November 2015.

10.      Gareth Cheong ("Cheong") is Wawasan's Chief Marketing Officer and Executive Director and, upon information and belief, a resident and citizen of Malaysia.

11.      Yap Wai Joon ("Yap") is an owner and principal of Wawasan, and upon information and belief, a resident and citizen of Malaysia.

12.      Agrofin Inc. ("Agrofin") is a California corporation with its principal place of business in Baldwin Park, California. Agrofin formerly imported inert fat products for sale in the United States.  Agrofin's inert fat products were manufactured by Wawasan.  Before Agrofin

1    began importing and distributing Wawasan product in the United States in the fall of 2015,

2    Agrofin had no employees with any experience in this market.

3         13.    Wei K. Yong-Su is an individual residing in Baldwin Park, California, and on

4    information and belief, is a citizen of Malaysia.  She is a former clerk in the accounting

5    department of Wawasan and purports to be the founder and principal of Agrofin.

6         14.    Paros Corp Pte Ltd ("Paros") is a Singapore corporation, and on information and

7    belief, its principal place of business is Malaysia.  Paros is affiliated with Wawasan.  Paros was

8    used as a front-organization by J.D. Heiskell and others in an effort to conceal their wrongful

9    conduct and the source of various payments made to Frank Dores.

10        15.    Palmolyn Pte Ltd ("Palmolyn") is a Singapore corporation, and on information and

11   belief, its principal place of business is Malaysia.  Palmolyn is affiliated with Wawasan.

12   Palmolyn was also used as a front-organization by J.D. Heiskell and others in an effort to conceal

13   their wrongful conduct.

14        16.    Wawasan, Cheong, Yap, Agrofin, Wei K. Yong-Su, Paros, and Palmolyn are

15   collectively referred to hereinafter as the "Wawasan Affiliates."  The Wawasan Affiliates have

16   reached a confidential settlement with the Bunnett Parties, and the Court has dismissed the claims

17   against them.  (*See* ECF No. 57.)

18                        **JURISDICTION AND VENUE**

19        17.    The Court has personal jurisdiction over J.D. Heiskell because J.D. Heiskell is a

20   California limited liability company and some of its members are California citizens.   J.D.

21   Heiskell also has a continuous presence in this judicial district and does business in this district.

22   Furthermore, it committed torts as a joint tortfeasor for the purpose of interfering with customer

23   relationship in this district and participated in the RICO enterprise that committed crimes in this

24   district.

25        18.    The Court has personal jurisdiction over Todd Gearheart because he regularly

26   conducts business in California both in his personal capacity and as Vice President of J.D.

27   Heiskell, a limited liability company with members who are California citizens and whose

28   principal place of business is in California.  Furthermore, he committed torts as a joint tortfeasor

for the purpose of interfering with customer relationship in this district and participated in the RICO enterprise that committed crimes in this district.

19.     The Court has personal jurisdiction over E&K Ag because E&K Ag is a limited liability company, and one of its members, Ray Gearheart, is a citizen of California. Furthermore, it committed torts as a joint tortfeasor for the purpose of interfering with customer relationship in this district and participated in the RICO enterprise that committed crimes in this district.

20.     This Court has personal jurisdiction over Frank Dores because he is a citizen and resident of California.  Furthermore, he committed torts as a joint tortfeasor for the purpose of interfering with customer relationship in this district and participated in the RICO enterprise that committed crimes in this district.  Frank Dores is the former General Manager for Plaintiff Energy Feeds, whose principal place of business is within this district.

21.     This Court has personal jurisdiction over Ray Gearheart because he is a citizen and resident of California.  Furthermore, he committed torts as a joint tortfeasor for the purpose of interfering with customer relationship in this district and participated in the RICO enterprise that committed crimes in this district.  Ray Gearheart was a former sales representatives for Plaintiff Energy Feeds, whose principal place of business is within this district.

22.     This Court has personal jurisdiction over Gearheart Ag because it is a California corporation and its principal place of business is in California.  Furthermore, Gearheart Ag committed torts as a joint tortfeasor for the purpose of interfering with customer relationship in this district and participated in the RICO enterprise that committed crimes in this district.

23.     The Court has subject matter jurisdiction over this dispute.  The Court has original jurisdiction over Plaintiffs' civil RICO and Robinson-Patman Act claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

24.     Venue is proper in this Court based on 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred within this judicial

1    district.  Venue is otherwise proper under 28 U.S.C. § 1391(b)(3) because each of the Defendants

2    is subject to this Court's personal jurisdiction.

3                            **SUMMARY OF THE CLAIM**

4           25.     Plaintiffs Bunnett & Company, Inc. and Energy Feeds International, LLC

5    (collectively, "Plaintiffs" or the "Bunnett Parties") are two affiliated, family-owned businesses

6    founded and led by William Bunnett.  The Bunnett Parties distribute nutritional supplements for

7    dairy cows across the United States, including sodium bicarbonate and inert fats.  Historically,

8    Bunnett & Company's principal product has been sodium bicarbonate, whereas Energy Feeds'

9    principal product has been inert fats.  William Bunnett has spent more than five decades in the

10   dairy cow nutrition industry developing the reputation of his businesses.  Before the events giving

11   rise to this litigation, the Bunnett Parties enjoyed long-term and stable customer relationships

12   through the Bunnett industry reputation and goodwill and by virtue of long-term, exclusive

13   distribution agreements.

14          26.     Both Bunnett & Company and Energy Feeds have historically operated under

15   exclusive distribution agreements with their major suppliers.  Bunnett & Company's long-term

16   exclusive supplier was Natural Soda, LLC ("Natural Soda"), a Delaware limited liability

17   company with its principal place of business in Colorado.  Bunnett & Company enjoyed the

18   exclusive right to sell Natural Soda product, sodium bicarbonate, within the western United

19   States.  Energy Feeds' long-term exclusive supplier was Wawasan, a Malaysian company.

20   Energy Feeds enjoyed the exclusive right to sell Wawasan inert fats within the entire United

21   States.

22          27.     Defendant J.D. Heiskell is a large animal feed distributor and agricultural trading

23   company.  A substantial portion of J.D. Heiskell's revenue is from the sale of nutritional

24   supplements for dairy cows.  Historically, J.D. Heiskell has purchased a large volume of products

25   from both Bunnett & Company and Energy Feeds; J.D. Heiskell was one of the Bunnett Parties'

26   largest customers by volume.

27          28.     Defendant Todd Gearheart is a Vice-President of J.D. Heiskell, and he manages

28   J.D. Heiskell's Northwest Business Group.  Defendant Ray Gearheart was a sales agent for the

Bunnett Parties until his resignation in October 2015.  Ray Gearheart is Todd Gearheart's father. Both the Gearhearts have longstanding relationships with J.D. Heiskell.  Even after Ray Gearheart semi-retired as a Vice President of J.D. Heiskell, he remained on the payroll as a consultant.  Even thereafter, Ray Gearheart often operated as a *de facto* agent of J.D. Heiskell, operating in J.D. Heiskell's best interests, protecting J.D. Heiskell from competitors, and providing J.D. Heiskell advantageous pricing.  Defendant Frank Dores was the Bunnett Parties' former General Manager until his resignation in October 2015.

29.    This case arises out of a scheme by the Defendants and others to establish and exert control over a new distribution channel for the supply and sale of dairy cow nutritional supplements, to grow that new distribution channel, and to obtain a competitive advantage over other market participants.  As part of their scheme, they have attempted to drive the Bunnett Parties out of business.  As detailed herein, beginning in 2015, Frank Dores breached his fiduciary duties owed to the Bunnett Parties with the encouragement, support, and assistance of J.D. Heiskell and the Gearhearts.  Defendants interfered with the Bunnett Parties' supplier and customer relationships, attempted to misappropriate those same relationships for themselves, and intentionally disrupted and attempted to destroy the Bunnett Parties' business in order to create an opening in the market for their alternative distribution channel.  This alternative distribution channel was formed through and continues to operate in reliance upon a continuing a pattern of racketeering activity by perpetrating mail and wire fraud, subornation of perjury, commercial bribery, violations of the Travel Act, money laundering, and concealment of assets and bankruptcy fraud.

30.    Defendants undertook and participated in further wrongdoing and criminal acts in order to conceal both their new distribution channel and their misconduct, thereby frustrating the Bunnett Parties' ability to counter Defendants' unfair competition and to obtain timely and effective legal relief.  Through its misconduct and the misconduct of the other Defendants, J.D. Heiskell has increased its own market position, in part at the expense of the Bunnett Parties, has substantially impaired the Bunnett Parties' businesses, and has increased its own profits by millions of dollars per year by way of reduced product costs and increased market share.

Although litigation has partially disrupted the Defendants' scheme, the Defendants continue to operate and control the distribution channel they created and to protect and expand that distribution channel through continuing racketeering activity, as detailed herein.  There is a substantial likelihood that Defendants will engage in further criminal acts in furtherance of maintaining and growing their alternative distribution channel.

31.     Prior to the events giving rise to this litigation, Plaintiffs Bunnett & Company and Energy Feeds were both successful and healthy companies, enjoying strong growth and stellar reputations in the industry.  Because of their success, they were targeted by others as potential buyout targets or joint venture partners.  In the summer of 2014, J.D. Heiskell and Energy Feeds discussed a potential transaction wherein J.D. Heiskell would acquire an ownership interest in Energy Feeds.  In these same conversations, J.D. Heiskell and Energy Feeds also discussed a potential joint venture.  J.D. Heiskell was represented during these discussions by Todd Gearheart and another J.D. executive.  During these discussions, J.D. Heiskell executed a Confidentiality Agreement prohibiting J.D. Heiskell from disclosing Energy Feeds' confidential information except under limited circumstances.  In reliance thereon, the Bunnett Parties shared confidential information with J.D. Heiskell, including information regarding margins, valuation, and sales projections.

32.     From exposure to Energy Feeds' confidential information, J.D. Heiskell learned that Energy Feeds' distribution business was highly profitable, and JDH began to set in motion a business strategy to obtain direct control over the distribution channel for the products it purchased and the associated profits.  After the discussions with Energy Feeds in the summer of 2014, on information and belief, J.D. Heiskell made its interest in establishing its own distribution channel known to Ray Gearheart, who in turn conveyed that information to Frank Dores. J.D. Heiskell wanted to move up the distribution chain, cut out the distributors like the Bunnett Parties, capture an increased share of the profits, and develop new customer and supplier relationships to further grow.

33.     In order to establish an alternative distribution channel, J.D. Heiskell needed to establish direct relationships with the Bunnett Parties' suppliers.  But both of the Bunnett Parties'

key suppliers, Wawasan and Natural Soda, were under exclusive distribution agreements.  J.D. Heiskell needed buy-in from these suppliers, as well as buy-in from the Bunnett Parties' own employees and sales agents, in order to effectuate its plan.

34.     For its own part, Wawasan desired a direct relationship with J.D. Heiskell as well, in order to maximize its own profits.  Ending the exclusive agreement with Energy Feeds, however, exposed Wawasan to substantial business risk.  The United States was and is Wawasan's largest market, and it had no sales team or means of distributing its products in the United States apart from Energy Feeds.  Before Wawasan could be persuaded to terminate its relationship with Energy Feeds and to begin selling direct to J.D. Heiskell, Wawasan needed assurances that an alternative distribution channel within the United States could be established, that steps could be taken to cripple Energy Feeds' business and to neutralize Energy Feeds as a potential competitor to the new distribution channel, and that the participants in this scheme could carry out their plan against Energy Feeds and other market participants with impunity from legal remedies.

35.     In or about September or early October 2015, J.D. Heiskell was presented with such an opportunity.  Not later than October 1, 2015, Frank Dores and the Bunnett Parties' other two sales representatives, non-party John Franklin and Defendant Ray Gearheart, agreed to work in concert to establish an alternative distribution channel.  Like J.D. Heiskell, Dores sought to enrich himself at the expense of Energy Feeds and Bunnett & Company by displacing them from their position in the market and capturing a larger portion of their profits for himself.  J.D. Heiskell's Todd Gearheart, Ray Gearheart, and Frank Dores agreed to form a competing distribution channel for dairy cow nutritional supplements, including inert fats and sodium bicarbonate as well as other minerals, and to disrupt the Bunnett Parties' supplier and customer relationships.

36.     At inception in the fall of 2015, the members of this enterprise were J.D. Heiskell, Todd Gearheart, E&K Ag, Ray Gearheart, Gearheart Ag, Frank Dores, John Franklin, and the Wawasan Affiliates (Wawasan, Gareth Cheong, Yap Wai Joon, Agrofin, Wei K. Yong-Su, Palmolyn, and Paros).  The goal of the enterprise was to establish an alternative distribution

channel and to grow that distribution channel to include ingredients from numerous suppliers and thereby to enjoy a dominant market position. The members of the enterprise individually and collectively carried out that goal and in fact established, concealed, and maintained this alternative distribution channel through a series of tortious and criminal acts. In the process, the members of the enterprise and the enterprise as a whole intentionally caused injury to the Bunnett Parties as a leading competitor for their distribution enterprise.

37. Ray Gearheart and Frank Dores' objective was not solely taking the Bunnett Party's suppliers and customers, but also using that business as a foundation to develop additional supply and customer relationships. J.D. Heiskell had multiple business objectives in joining and participating in the management of the enterprise. First, J.D. Heiskell desired an uninterrupted supply of Wawasan product that could be timely and reliably delivered to its customers. Second, J.D. Heiskell wanted to maintain an advantageous pricing relationship with its preferred strategic supply channel—Wawasan—a strategic advantage that is directly proportional to the robustness and market share of that channel. Third, J.D. Heiskell wanted visibility on the prices its competitors were paying for the same products, so that it could maximize its competitive advantage over them. Fourth, J.D. Heiskell wanted to be able to control the distribution of Wawasan product to ensure that no one else could sell Wawasan products to J.D. Heiskell's customers. Fifth, J.D. Heiskell wanted to "move up the food chain," selling to persons that it previously competed with, and thereby increasing its own margins.

38. J.D. Heiskell and its Vice-President, Todd Gearheart, were an integral part of the scheme to create this new distribution channel and displace Plaintiffs' businesses. From the outset, J.D. Heiskell and Todd Gearheart aided and abetted Dores' breach of fiduciary duty and encouraged Wawasan to terminate its exclusive distribution agreement with Energy Feeds. J.D. Heiskell encouraged Ray Gearheart to breach his duties as Energy Feeds' agent while still ostensibly working on Energy Feeds' behalf and then to resign from working on behalf of Energy Feeds, by promising Ray Gearheart that J.D. Heiskell would continue purchasing Wawasan product through Ray Gearheart after he resigned, despite both the agency relationship between Energy Feeds and Ray Gearheart and the exclusive distribution agreement between Energy Feeds

and Wawasan. J.D. Heiskell, Frank Dores, Todd Gearheart, and Ray Gearheart assured Wawasan that they would be able to transition customers from the Bunnett Parties.

39. The understanding between J.D. Heiskell and the Gearhearts was simple. On information and belief, J.D. Heiskell promised Todd Gearheart and Ray Gearheart that as long as the Gearhearts took care of J.D. Heiskell, without regard to the requirements of law, then J.D. Heiskell would take care of the Gearhearts with a similar disregard for the requirements of law. The Gearhearts would take care of J.D. Heiskell by ensuring that J.D. Heiskell had a reliable supply of product at the best prices, protecting J.D. Heiskell from price competition with others, telling J.D. Heiskell its competitors' margins, and protecting J.D. Heiskell's customers from sales from other competitors. In exchange, on information and belief, J.D. Heiskell promised that the Gearhearts would always get their cut of the profits: Ray Gearheart's cut was his commissions on sales to J.D. Heiskell; Todd Gearheart's cut was his vice president job and a share of J.D. Heiskell-Idaho's profits, which J.D. Heiskell promised Todd Gearheart would continue to receive even if his unlawful conduct on behalf of J.D. Heiskell was ever publicly disclosed.

40. Ray Gearheart actually began arranging orders for product between J.D. Heiskell and Wawasan before he resigned from Energy Feeds, and without disclosing to Energy Feeds his relationship with Wawasan, at the very same time he ostensibly was negotiating pricing and quantity terms on behalf of Energy Feeds with J.D. Heiskell for the very same products, in breach of the duties he owed to the Bunnett Parties as their agent for negotiating and arranging sales with J.D. Heiskell and other customers.

41. Ray Gearheart had agreed to represent exclusively the Bunnett Parties' products and to act as the Bunnett Parties' agent for negotiating terms for the sale of the Bunnett Parties' products. Despite the duties he owed to the Bunnett Parties as their agent, Ray Gearheart secretly worked to enrich J.D. Heiskell at the Bunnett Parties' expense. In the fall of 2015, Ray Gearheart induced Energy Feeds to substantially reduce the prices Energy Feeds charged to J.D. Heiskell-Idaho. Ray Gearheart induced Energy Feeds to do so by providing false market information and by telling Energy Feeds that lower prices were essential to persuade J.D. Heiskell-Idaho to continue to purchase exclusively from Energy Feeds. In October 2015, Todd Gearheart assured

1    Energy Feeds that J.D. Heiskell-Idaho was still purchasing exclusively from Energy Feeds and

2    had no plans to begin purchasing elsewhere, and he affirmed what he has described in his

3    previous trial testimony as a handshake deal with Energy Feeds to continue dealing exclusively

4    with them for inert fats.

5         42.    At the time that Todd Gearheart provided these assurances and affirmed the

6    parties' handshake agreement in October 2015, both he and his father Ray Gearheart knew that

7    his statements to the Bunnett Parties were false.  Todd Gearheart, with Ray's assistance, already

8    had reached agreement with Gareth Cheong of Wawasan to cut out Energy Feeds as the

9    distributor of Wawasan's products, and J.D. Heiskell-Idaho already had begun placing orders

10   directly with Wawasan.  J.D. Heiskell induced Ray Gearheart to participate in this deception of

11   Energy Feeds in breach of his duties as Energy Feeds' agent, persuading Energy Feeds to cut J.D.

12   Heiskell-Idaho's prices in reliance on a handshake promise Ray Gearheart knew to be false and

13   concealing from Energy Feeds the fact that, with Ray Gearheart's active participation and

14   support, J.D. Heiskell-Idaho was placing direct orders with Wawasan in breach of the exclusive

15   distribution agreement between Wawasan and Energy Feeds.

16        43.    Similarly with respect to the exclusive distribution agreement between Bunnett &

17   Company and Natural Soda, J.D. Heiskell, Dores, and the Gearhearts worked together to persuade

18   Natural Soda to terminate the exclusive distribution agreement.  They manufactured rumors of

19   "inner turmoil" with the Bunnett Parties, and J.D. Heiskell urged Natural Soda to begin selling

20   directly to them, even though J.D. Heiskell knew there was still an exclusive agreement between

21   Bunnett & Company and Natural Soda.  Again, Ray Gearheart began assisting J.D. Heiskell with

22   negotiations with Natural Soda before Ray Gearheart had even resigned from the Bunnett Parties.

23        44.    Beginning not later than September or early October 2015, J.D. Heiskell, Dores,

24   and the Gearhearts worked with the Wawasan Affiliates to establish an alternative distribution

25   channel for inert fat product for sale within the United States.  Absent the creation of this

26   alternative distribution channel through the assistance and encouragement of the Defendants,

27   Wawasan would not have been able to terminate its exclusive distribution agreement with Energy

28   Feeds without experiencing immediate and severe disruption of its own business.  Even before

Wawasan terminated the exclusive distribution agreement in November 2015, J.D. Heiskell began operating as a distributor of Wawasan products and has now misappropriated many of the Plaintiffs' customer relationships.  J.D. Heiskell's influence, encouragement, and participation in establishing this new distribution channel was essential to Wawasan's ultimate decision to terminate its exclusive distribution agreement with Energy Feeds and work with Defendants to establish the competing distribution channel.

45.     After the Defendants reached their illicit agreement, Dores, Franklin, and Ray Gearheart each resigned from Plaintiffs' employ between October 23, 2015 and October 26, 2015.  Evidence of the illicit nature of the agreement between Dores and the other Defendants and their consciousness of wrongdoing is evidenced by the elaborate steps taken to conceal their conduct.   This concealment was essential for three reasons.  First, the Defendants needed to conceal the alternative distribution channel and the scope of their misconduct from the Bunnett Parties in order to frustrate the Bunnett Parties' and their competitors' ability to obtain injunctive relief to prevent or hamper the competing distribution channel.   Second, concealment was necessary to gain Frank Dores' assistance.  Frank Dores repeatedly had expressed his concern about his own personal liability and his preference to engage in business under the table.  Only through concealment was Frank Dores willing to continue to work with the other Defendants. Third, concealment gave the Defendants a competitive advantage because the Bunnett Parties and Defendants' competitors were taken by surprise by the emergence of a new distribution channel and were unable even to identify their new competitor or the resources at that competitor's disposal.   The Defendants had orchestrated circumstances where they could undercut market prices and offer continuity of supply, at a time when their same concerted conduct had placed the Bunnett Parties as a key market participant in a position of having supply shortages, and Defendants carried out a campaign of market disparagement against the Bunnett Parties to further Defendants' scheme.

46.     The Defendants took elaborate measures to conceal their wrongdoing.  In October 2015 before he resigned, Frank Dores told William Bunnett that he was taking a few days' vacation because of alleged stress.  While allegedly suffering from debilitating stress, Frank

1    Dores incorporated a new business entity, FM Ag Enterprises, Inc., and continued to work in

2    concert with the other Defendants.   Frank Dores, despite his alleged disabling stress,

3    communicated with numerous customers and suppliers of the Bunnett Parties throughout October

4    and November of 2015.  Frank Dores had decided that because of the litigation risk, he would

5    have to compete against the Bunnett Parties "under the table" rather than overtly.  Frank Dores

6    discussed with Natural Soda a potential arrangement where Natural Soda would compensate him

7    with a "backend sourcing fee" or pay his wife for services that he would in fact render.  Frank

8    Dores has admitted in his testimony under oath that these were underhanded methods of

9    conducting business.

10          47.    Wawasan, in exchange for his efforts to help Wawasan and the Defendants carry

11   out their scheme, compensated Frank Dores through similar underhanded methods, seeking to

12   conceal the payments from the Bunnett Parties and others.   Rather than compensate Dores

13   directly for his work on behalf of the alternative distribution channel, even after Dores had

14   resigned from Plaintiffs, Wawasan compensated him indirectly through surreptitious payments.

15   After it terminated the exclusive distribution agreement with Energy Feeds, Wawasan caused a

16   Wawasan affiliate, Paros, to make payment to FM Ag Enterprises, Inc., the company that Frank

17   had formed in October 2015 when he was supposedly too sick to work.  During November 2015,

18   Frank Dores solicited numerous Bunnett Party' customers on behalf of the new, competing

19   distribution channel.

20          48.    Frank Dores even applied for and received disability from the State of California

21   under a false claim of debilitating stress.  J.D. Heiskell and the Gearhearts were well aware that

22   Frank Dores' claims for workers' compensation and disability were fraudulent, even noting as

23   much in email correspondence.  Further, the Gearhearts discussed in email correspondence that

24   Frank Dores' attorney had advised him to pursue a disability or workers' compensation claim as a

25   litigation defense in case the Bunnett Parties sued him after he resigned.

26          49.    Wawasan also made payments to John Franklin and Ray Gearheart beginning as

27   early as November 2015.  These payments, however, were made through Wawasan's affiliate,

28   Paros, for the purpose of disguising that Wawasan was the true payer.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

THIRD AMENDED COMPLAINT

50.     Further steps were taken to conceal the Defendants' and Wawasan's new United States distribution channel.   On or about October 1, 2015, Wawasan's principals formed Palmolyn as a shell company.   On information and belief, the sole purpose for creating Palmolyn was to serve as a front to ship product to the United States, so that "Wawasan" would not appear on shipping manifests and records.   J.D. Heiskell and Agrofin went so far as to import Wawasan product into the Port of Vancouver rather than import directly into the United States to further conceal their misconduct, even though their product shipments were destined for customers in the United States much more proximate to the Port of Oakland used customarily by Wawasan to ship product to the United States.

51.     Even amongst themselves and in their own communications to each other, the Defendants used elaborate measures to conceal their wrongdoing.   For example, in correspondence regarding Frank Dores, the Defendants would often refer to him as "FD" or simply "F."   Some of the Defendants used their spouse's email accounts to send invoices and receive correspondence rather than their own.   Invoices sent between the Defendants and other members of the scheme were intentionally vague and misleading, providing descriptions of services divorced from reality.   Some of the members of the scheme used aliases, i.e. fake names, even in their communications with one another.   In short, the Defendants knew that they were engaged in wrongdoing and took elaborate measures to attempt to conceal that wrongdoing.

52.     Because of the Defendants' elaborate concealment methods, Plaintiffs were unaware of the vast majority of the events giving rise to this litigation at the time they occurred. Despite these elaborate efforts at concealment, Plaintiffs still obtained sufficient evidence to show that Frank Dores had breached his fiduciary duties and was competing in the marketplace as a result of those breaches.   Plaintiffs filed suit against Frank Dores on November 24, 2015, and obtained a temporary restraining order from Texas state court.   Frank Dores subsequently removed the case to the United States District Court for the Western District of Texas, which entered another temporary restraining order against Frank Dores.   In January of 2016, Frank Dores filed for bankruptcy claiming that his "disability" prevented him from gainful employment.

53.     But even after Plaintiffs filed suit against Frank Dores in November 2015 for breach of fiduciary duty and misappropriation of trade secrets and obtained multiple temporary restraining orders against Dores, and even after Dores applied for government disability benefits because allegedly too stressed to work and then even commenced bankruptcy proceedings based on his supposed disability, Wawasan and the Defendants continued to discretely work with and make under the table payments to Dores in January and March of 2016.  Wawasan and the Defendants made these later payments to Dores after he had filed for bankruptcy and despite knowledge of Frank Dores' phony disability claim.   The payments were completed by international wire transfer, documented with fraudulent invoices from Todd Gearheart, who then wrote checks to Frank Dores' friends and family to avoid making payments directly to Dores. The payments were structured in this manner to conceal them from Plaintiffs and from the judiciary and authorities.  The bankruptcy court has since dismissed with prejudice Frank Dores' bankruptcy case because of his repeated "egregious misconduct" and concealment from the court of these payments.

54.     J.D. Heiskell was a key participant in these under the table payments made in January and March of 2016.  J.D. Heiskell's Todd Gearheart was the one who sent fraudulent invoices to Wawasan to conceal the payments to Dores and assisted in secreting internationally wired funds to Frank Dores through several layers of intermediaries in order to hide the source and purpose of the payments.  Todd 'Gearheart used his J.D. Heiskell corporate email account to conduct all of these transactions.  The fact that Todd Gearheart used his company email shows he believed he was acting in the interest of J.D. Heiskell in completing these payments.

55.     Todd Gearheart's acts were not the isolated misconduct of a single "rogue" executive.   Even after conducting a purported corporate investigation of Todd Gearheart's conduct, J.D. Heiskell has never taken any action to sanction or discipline Todd Gearheart or limit his corporate authority.  To the contrary, J.D. Heiskell has ratified and affirmed the unlawful acts of its senior executive by continuing to reap the benefits of his participation in the unlawful scheme and seeking to further strengthen and enhance J.D. Heiskell's business relationships with the Bunnett Parties' former suppliers.  J.D. Heiskell has fully endorsed, accepted, and ratified

Todd Gearheart's unlawful acts and currently enjoys the benefits of those acts in order to gain an unfair competitive advantage.  Through its misconduct and the misconduct of its vice president, Todd Gearheart, J.D. Heiskell has assured itself continued supply of product at favorable terms, which supply began as a result of the tortious conduct described herein.  J.D. Heiskell continues to enjoy a direct relationship with Wawasan and Ray Gearheart.

56.     Further evidence of J.D. Heiskell's affirmative ratification of its Vice President's actions occurred when J.D. Heiskell's own counsel participated in in a proceeding in which Todd Gearheart gave testimony about his business dealings on behalf of J.D. Heiskell that J.D. Heiskell knew to be false but that suited J.D. Heiskell's own litigation strategy.  At an evidentiary hearing in July 2017 regarding whether Todd Gearheart and others should be held in contempt for violating temporary restraining orders, Todd Gearheart testified under oath and his counsel offered as a key case theme that Energy Feeds had "cut-off" J.D. Heiskell-Idaho and refused to supply it with product after Ray Gearheart resigned.  Todd Gearheart offered this testimony, and his counsel presented this argument despite the fact that J.D. Heiskell's own corporate representative had already testified in deposition that, after a corporate investigation of the issue, J.D. Heiskell had concluded there was no evidence whatsoever that Energy Feeds had in fact "cut-off" J.D. Heiskell-Idaho.  Instead, it was an explanation contrived by Defendants to frustrate, burden, and harass the Bunnett Parties in their efforts to obtain relief against Defendants' scheme by interposing frivolous defenses for the sole purpose of multiplying the Bunnett Parties' litigation expense.

57.     J.D. Heiskell has further benefitted from the alternative distribution channel because Ray Gearheart has leveraged control over the new distribution channel for J.D. Heiskell's direct benefit.  Ray Gearheart has diverted business to J.D. Heiskell, ensured that the new distribution channel and Wawasan itself do not sell product to J.D. Heiskell's customers in competition with J.D. Heiskell, provided market information to J.D. Heiskell including visibility on pricing to other customers in the Western United States, diverted customers of J.D. Heiskell's competitors to J.D. Heiskell, and provided favorable pricing terms to J.D. Heiskell.

58.    In sum, as detailed herein, the Defendants unlawfully schemed to establish a new distribution channel and grow that distribution channel into the future.  In carrying out that scheme, they attempted to displace the Bunnett businesses and replace them with their own competing distribution channel and to erode their other competitors' market share through tortious and criminal wrongdoing that they concealed and continue to conceal through fraud and perjury.  Defendants aided and abetted Plaintiffs' former general manager's breach of fiduciary duty, tortuously interfered with Plaintiffs' customer relationships and suppler contracts, commercially disparaged Plaintiffs, and engaged in methods of unfair competition rising to the level of criminal wrongdoing.

59.    Furthermore, the Defendants carried out their scheme through a pattern of criminal and fraudulent acts designed not only to effectuate their scheme, but also to conceal their misconduct and prevent Plaintiffs from enforcing their legal rights in ongoing legal proceedings. The Defendants' enterprise committed a pattern of criminal acts including commercial bribery, mail fraud, wire fraud, money laundering, suborning perjury, concealment of assets and bankruptcy fraud, and violation of the Travel Act, in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), and exposing the Defendants to liability under the Robinson-Patman Act, the California Unfair Competition Law, and common law.  These predicate acts are part of the enterprise's regular way of conducting business with a substantial threat of repetition.

60.    As a result of the Defendants' misconduct, Plaintiffs have suffered substantial injury to their business reputation, customer, supplier, and employee relationships, and their ability to continue as competitive businesses has been significantly diminished.  Defendants, by contrast, have substantially profited from their wrongful acts and continue to profit.

## DETAILED FACTUAL ALLEGATIONS

### William Bunnett Founds and Leads Bunnett & Company and Energy Feeds

61.    Bunnett & Company and Energy Feeds are two affiliated, family-owned businesses founded and led by William Bunnett.  William Bunnett has over the course of his more than sixty year career developed Bunnett & Company's and Energy Feeds' reputations by developing and bringing to market new dairy cow nutrition products, building strong customer

relationships, and providing reliable customer service and logistical support. Bunnett & Company and Energy Feeds are nationally recognized distributors in the dairy cow nutrition supplements industry.

62.     William Bunnett has been an active member in the feed industry for the past six decades.  He successfully distributed nutritional supplements on behalf of other companies and assisted in researching and developing new nutritional supplements before he founded Bunnett & Company and Energy Feeds.  William Bunnett began working in the dairy industry in 1960, employed as a commodity trader dealing in various major feed ingredients, including sale to feed manufacturers and cattle feeding operations throughout the western United States.  Beginning in 1969, William Bunnett assisted in building and establishing mineral supplement plants in numerous western states.  Mr. Bunnett also pioneered a new process for manufacturing suspension supplements for cattle feed lots and dairy farms through his company Feed Commodities Inc., which he eventually sold.  From 1969 through 1980, William Bunnett also acted as a consultant for the construction of plants for the manufacture of solid molasses feed used in the cattle industry.

63.     William Bunnett established Bunnett & Company in 1984 as a distributor of various dairy cow nutritional supplements, including sodium bicarbonate and other buffers given to dairy cows.  Bunnett & Company sold buffers for various suppliers, including Allied Chemical, Church & Dwight, and Tenneco Minerals Company.  Bunnett & Company for many years has distributed product to dairymen in the west and southwest regions of the United States, as well as portions of the Midwest and eastern United States.

64.     William Bunnett founded Energy Feeds in 1998.  Energy Feeds sources and distributes various nutritional supplements to dairy cow feed manufacturers across the United States.  Energy Feeds primarily sources and distributes inert fats, which are used as a nutrition product for dairy cows.  Inert fats are primarily derived from palm oil.

65.     The products offered by Bunnett & Company and Energy Feeds are complementary. Generally stated, the mineral buffers sold by Bunnett & Company neutralize the acidity of the cow's stomach, whereas the inert fats sold by Energy Feeds increase the quality and

quantity of the cow's milk.  Both products are sold to animal feed manufacturers for use as a nutritional supplement principally for dairy cows.  Because many dairymen purchase products from both Bunnett & Company and Energy Feeds, the two companies collaborate in their marketing and sales efforts and share overlapping management and employees.

66.     The success of both businesses can be attributed in large part to the businesses' customer relationships and reputation in the dairy feed supplement industry. Bunnett & Company and Energy Feeds have developed and maintained strong customer relationships by providing personal service and reliable, on-time delivery of high quality nutritional supplements.  Sodium bicarbonate is distributed in bulk, typically by rail or truck, requiring careful planning and coordination.   Inert fats are also sourced and distributed in bulk quantities, typically from overseas manufacturers.  Bunnett & Company and Energy Feeds have devoted substantial time, resources, and effort in providing exceptional customer service and establishing strong business reputations.

**Bunnett & Company's and Energy Feeds' Distribution Models**

67.     As noted, Plaintiffs distribute two general types of nutritional supplements for dairy cows: Bunnett & Company distributes minerals, primarily sodium bicarbonate, and Energy Feeds distributes inert fats.  Until the fourth quarter of 2015, Plaintiff Energy Feeds' primary supplier of inert fats was Wawasan, and Plaintiff Bunnett & Company's primary supplier of minerals was Natural Soda.

68.     Bunnett & Company and William Bunnett began working with Natural Soda or its predecessors in the early 1990s.  Natural Soda is one of the country's largest suppliers of feed grade sodium bicarbonate, a nutritional supplement given to dairy cows and also sold for other uses.  Natural Soda collects and processes sodium bicarbonate and then supplies it to independent distributors.  Bunnett & Company was Natural Soda's exclusive distributor of feed-grade sodium bicarbonate within the western United States for use as an animal nutritional supplement, pursuant to several successive exclusive distribution agreements from the 1990s until December 2015.

69.     Although the exclusive distribution arrangement between Bunnett & Company and Natural Soda or its corporate predecessor had first commenced in the 1990s, for the time period most significant to this matter, the relevant contract is a long-term exclusive distribution agreement with Natural Soda (the "Natural Soda EDA"), that was first executed in 2005 and then renewed and amended in 2010.  The Natural Soda EDA extended until September 2016, with automatic annual renewal thereafter except upon timely notice of non-renewal.  It appointed Bunnett & Company as the exclusive distributor of Natural Soda's feed grade sodium bicarbonate in the western half of the United States.  Bunnett & Company agreed that it would not sell any competing products, and Natural Soda agreed it would not sell any of its animal feed grade sodium bicarbonate to customers or appoint another distributor within Bunnett & Company's exclusive sales territory.  The Natural Soda EDA contained exclusivity, termination, renewal, timing, notice, and other provisions designed to protect Bunnett & Company's business and customer relationships.  The Natural Soda EDA would automatically renew unless either party provided the other with ninety days' notice, and required that Natural Soda continue to accept and fulfill orders for a three month tail even after termination.  The Natural Soda EDA's termination and renewal provisions were timed to coincide with the annual selling cycle for sodium bicarbonate, which typically was sold by Bunnett & Company to its customers on a twelve-month calendar year contract.

70.     Energy Feeds and William Bunnett began working with Wawasan in the late 1990s.  William Bunnett became interested in developing nutritional supplements derived from palm oil in the 1990s.  These products are generally known as inert fats.  He first attempted to develop domestic manufacturing capabilities within the United States.  When those efforts proved commercially unviable, William Bunnett turned to Malaysia and Indonesia to find a manufacturer closer to the plantations supplying palm oil.  William Bunnett approached Wawasan and explained his plans and ambitions to develop a new market for palm oil-derived dairy cow nutritional supplements within the United States.  At the time, Wawasan had no customer base in the United States and no knowledge of the U.S. market.

71.     William Bunnett's company Energy Feeds and Wawasan agreed to collaborate in building this new market and together were an early entrant to the United States market for inert fat nutritional supplements.   In September 2008, Plaintiff Energy Feeds became Wawasan's exclusive authorized agent for the marketing, sale, supply, and distribution of various specialty feed fat products in the Western United States, and Wawasan authorized Energy Feeds to act and represent it as the exclusive distributor, sales, supplier, and marketing representative for inert fats in the Western United States. Plaintiff Energy Feeds and Wawasan executed a second exclusive distributor agreement in November 2013, the "Wawasan EDA," with a five-year term, that extended the exclusive territory to the entire United States.  Similar to the Natural Soda EDA, the Wawasan EDA contained numerous provisions designed to protect Energy Feeds' customer relationships and exclusive sales territory, including renewal, noncompete, and exclusivity provisions.

72.     Before William Bunnett began working with Wawasan and Natural Soda, he already had many years of experience selling and distributing nutritional supplements for dairy cows and already had developed extensive customer relationships and industry knowledge, including extensive experience in the complicated planning and logistics of distributing bulk animal feeds to a geographically dispersed base of customers who depend on regular, reliable deliveries.

73.     Through the Plaintiffs' promotion and sale of Wawasan's products within the United States, Energy Feeds developed a brand identity and a customer base for Wawasan's products.  Wawasan did not undertake its own product marketing or business developments efforts in the dairy ruminants business in the United States.  Instead, Wawasan relied on Plaintiffs to develop at their own expense a customer base for palm oil derived specialty fat products, drawn substantially from William Bunnett's existing customer relationships and industry connections. As a result of Plaintiffs' efforts, Wawasan products were sold to feed mills and independent sales agents who then sold the Wawasan products to the end-users, dairy farms.

74.     Dores is the former general manager of both Bunnett & Company and Energy Feeds.   Frank Dores resigned in October 2015.   As General Manager, Frank Dores was

1   responsible for overseeing purchasing, shipping, warehouse inventory, and customer pricing and

2   deliveries.  He had substantial knowledge of Plaintiffs' confidential information by virtue of his

3   relationship with Bunnett & Company and Energy Feeds, including information regarding

4   inventory and supply chain management, pricing and product development, and customer

5   relationships.

6        75.     Non-party Franklin and Defendant Ray Gearheart are former sales representatives

7   of Plaintiffs.  Franklin was responsible for selling Plaintiffs' products primarily in the Midwest

8   and eastern United States.  Ray Gearheart was responsible for selling Plaintiffs' products

9   primarily in the Western United States.  Franklin and Ray Gearheart resigned within days of

10   Frank Dores' resignation on October 23, 2015.  Franklin, Ray Gearheart, and Frank Dores are

11   referred to herein collectively as the "Former Representatives."  The Former Representatives

12   relied heavily on the reputation and experience of the Plaintiffs in their sales efforts.  Indeed,

13   many of Plaintiffs' customers have had relationships with William Bunnett for decades, well

14   before the Former Representatives even came to work for the Plaintiffs.

15        76.     Defendant Todd Gearheart is Ray Gearheart's son.  Todd Gearheart is the Vice

16   President of J.D. Heiskell, which has historically been one of Plaintiffs' largest volume

17   customers.  J.D. Heiskell is one the nation's largest feed distributors.  Although J.D. Heiskell was

18   historically one of Plaintiffs' largest customers, because of J.D. Heiskell's size and geographic

19   breadth, it also competed with Plaintiffs in a limited manner in some markets and with respect to

20   some customers.

21        77.     Both Ray Gearheart and Todd Gearheart have long histories with J.D. Heiskell.

22   Ray Gearheart is a former senior vice-president for J.D. Heiskell.  In that role, he had profit and

23   loss responsibility for the entire feed division of J.D. Heiskell, which included nutritional

24   supplements for dairy cows and other products.  Even after Ray Gearheart semi-retired and

25   resigned from J.D. Heiskell, he remained on the J.D. Heiskell payroll for five years under a

26   consulting agreement.  Todd Gearheart has worked at J.D. Heiskell or companies affiliated with

27   J.D. Heiskell for more than twenty years, having never been employed by anyone else in a

28   professional capacity.  The current President and Chief Executive Officer of J.D. Heiskell, Ryan

Pellett, received his first job with a corporate predecessor of J. D. Heiskell because he was hired by Ray Gearheart for an entry-level role in which he worked side-by-side with Todd Gearheart. There is a high level of personal loyalty among Pellett and the two Gearhearts.

**Plaintiffs and Defendant J.D. Heiskell Discuss a Potential Joint Venture**

78.     Prior to the events giving rise to this litigation, Plaintiffs Bunnett & Company and Energy Feeds were both successful and healthy companies, enjoying strong growth and stellar reputations in the industry.  Because of their success, they were targeted by others as potential buyout targets or joint venture partners.

79.     Throughout the summer of 2014, J.D. Heiskell and Energy Feeds discussed a potential transaction wherein J.D. Heiskell would acquire an ownership interest in Energy Feeds. In these same conversations, J.D. Heiskell and Energy Feeds also discussed a potential joint venture.

80.     In the course of these discussions, a meeting was held in July 2014 at William Bunnett's ranch in Wyoming.  Both Rick Bowen, Vice President for the California region of J.D. Heiskell, and Todd Gearheart attended from J.D. Heiskell.  Rick Bowen and Todd Gearheart signed a Confidentiality Agreement at the outset of the meeting on behalf of J.D. Heiskell.  The Confidentiality Agreement recited that it would be "necessary for Energy [Feeds] to provide certain confidentiality and/or proprietary information to [J.D.] Heiskell," and that "to assure the protection of such information, the parties are entering in to this Confidentiality Agreement."

81.     The Confidentiality Agreement prohibited J.D. Heiskell from disclosing Energy Feeds' confidential information except under limited, enumerated circumstances.  Todd Gearheart signed the Confidentiality Agreement on behalf of J.D. Heiskell.  William Bunnett then provided the J.D. Heiskell representatives with a number of documents showing actual results and projections of product volumes, growth by customer, EBITDA projections, and other detailed financial information.  They also discussed the valuation of the business.

82.     Another meeting regarding a potential investment opportunity was held in April of 2015 between Rick Bowen of J.D. Heiskell and William Bunnett and his son, Jeffrey John Bunnett.  Energy Feeds and J.D. Heiskell decided to postpone further joint venture or investment

1    opportunity discussions until later in 2015.  Energy Feeds and Bunnett & Company also engaged

2    in separate joint venture discussions with Natural Soda and Wawasan during 2015.

3        83.    On information and belief, J.D. Heiskell misused the confidential information

4    shared in confidence in breach of the Confidentiality Agreement.  Among other misuse, J.D.

5    Heiskell used this confidential information to assist in competing with Energy Feeds and

6    establishing an alternative distribution channel for inert fat products within the United States, as

7    detailed herein.  Indeed, the financial disclosures and J.D. Heiskell's subsequent realization of the

8    profits it could make as part of an alternative distribution channel was, on information and belief,

9    an impetus for J.D. Heiskell's participation in the scheme that gives rise to this action.

10   **Energy Feeds' Relationship with Wawasan During 2015**

11       84.    During 2015, the relationship between Energy Feeds and Wawasan showed signs

12   of strain.  Wawasan has not historically employed any sales force of its own.  Instead, it

13   contracted with distributors, such as Energy Feeds, and these distributors in turn sold inert fats to

14   end purchasers.  Indeed, Energy Feeds was Wawasan's exclusive distributor for many years for

15   the western United States market, and since 2013, the entire United States.  Beginning in early

16   2015, Wawasan appeared somewhat dissatisfied with the economics of this distribution model

17   and preferred a distribution network that Wawasan owned and controlled.  Also during 2015,

18   Bunnett & Company's exclusive supplier, Natural Soda, indicated its desire for a distribution

19   network that it owned and controlled.

20       85.    Both Wawasan and Natural Soda wrongfully terminated their respective exclusive

21   distribution agreements with Plaintiffs in the fourth quarter of 2015.  Plaintiffs have since learned

22   that these terminations were carried out to further an elaborate, unlawful conspiracy among the

23   Defendants named in this suit and others.

24

25   **Defendants' Scheme to Establish an Alternative Distribution Channel, Grow that Channel, and Drive the Bunnett Parties Out of Business**

26

27       86.    As Plaintiffs' General Manager, Frank Dores was uniquely positioned to observe

28   that both Wawasan and Natural Soda were contemplating attempting to remove William

Bunnett's businesses as independent, exclusive sales distributors and move to a model where the supplier had more direct control over distribution thereby capturing a larger share of the profits. Just like Wawasan and Natural Soda, Frank Dores wanted to cut William Bunnett out of the picture and capture Bunnett & Company's and Energy Feeds' profits for himself.   He contemplated a venture that would sell directly to Bunnett & Company's and Energy Feeds' customers, utilizing his employers' confidential information, usurping Bunnett & Company's and Energy Feeds' business opportunities, and interfering with their customer relationships. Essentially, he wanted to duplicate William Bunnett's business model, distributing both minerals and inert fats and other nutritional supplements, take Plaintiffs' customers and suppliers with him, and then use those customers and suppliers as a base to grow the competing distribution channel.

87.     During 2015, Dores approached Franklin and Ray Gearheart and explained the potential plan.   Both of these individuals acted as independent sales agents for Bunnett & Company and Energy Feeds.  They discussed amongst themselves the possibility that they would resign from Bunnett & Company and Energy Feeds in unison and establish an alternative distribution channel.  These discussions turned into action no later than the fall of 2015 when Todd Gearheart, J.D. Heiskell, and the Wawasan Affiliates agreed to establish an alternative distribution channel.

88.     At inception in the fall of 2015, the members of this enterprise were J.D. Heiskell, Todd Gearheart, E&K Ag, Ray Gearheart, Gearheart Ag, Frank Dores, John Franklin, and the Wawasan Affiliates (Wawasan, Gareth Cheong, Yap Wai Joon, Agrofin, Wei K. Yong-Su, Palmolyn, and Paros).   The enterprise was formed in order to establish a new, ongoing distribution channel for nutritional supplements for dairy cows.  The enterprise was formed while the Bunnett Parties' exclusive distribution agreements with Wawasan and Natural Soda were still in force.   The enterprise planned to cripple the Bunnett Parties' business, misappropriate its customers and suppliers, and then use those customers and suppliers relationships as a base to further grow their competing distribution channel.

89.     As part of the Defendants' scheme, Frank Dores breached his fiduciary duties before he resigned by, among other wrongful acts, entering into an agreement with the other

Former Representatives to resign in unison, to distribute inert fat products other than through Plaintiffs to Plaintiffs' customers even before they resigned, and to disparage Plaintiffs in the marketplace.  Frank Dores further reached agreements with some of the Bunnett Parties' key supplier and customer relationships, namely with J.D. Heiskell, Wawasan, and Natural Soda, before he resigned.  E-mail correspondence obtained in discovery from other litigation, and which has been filed by agreement in the public record, shows that this scheme began no later than October 1, 2015.  (*See, e.g.,* Ex. A-3.)

90.     No later than September or early October 2015, J.D. Heiskell had already reached an agreement with the Former Representatives wherein they would distribute inert fats product in the United States in competition with Energy Feeds.  The Former Representatives sought aid and support from J.D. Heiskell because it represented such a large percentage of the Bunnett Parties' total revenues and because of the Gearhearts close relationship with J.D. Heiskell.   In this manner, Frank Dores, J.D. Heiskell, Ray Gearheart, and Todd Gearheart set the stage for creating the alternative distribution channel needed to convince Wawasan it could terminate its exclusive supply agreement with Energy Feeds without an interruption in distribution and profits.

91.     Regardless of their personal loyalty to William Bunnett, the Bunnett Parties' customers could not continue to do business with a distributor who simply had no product to sell after being terminated by its exclusive supplier.  Defendants knew that many customers preferred to purchase both sodium bicarbonate and inert fats from related companies or the same salesman, so any harm to Energy Feeds' reputation would also assist them in their plan to distribute sodium bicarbonate and other products.

92.     J.D. Heiskell had multiple business objectives in joining and participating in the management of the enterprise.  First, J.D. Heiskell desired an uninterrupted supply of Wawasan product that could be timely and reliably delivered to its customers.  Second, J.D. Heiskell wanted to maintain an advantageous pricing relationship with its preferred strategic supply channel – Wawasan – a strategic advantage that is directly proportional to the robustness and market share of that channel.  Third, J.D. Heiskell wanted visibility on the prices its competitors were paying for the same products, so that it could maximize its competitive advantage over them.  Fourth,

J.D. Heiskell wanted to be able to control the distribution of Wawasan product to ensure that no one else could sell Wawasan products to J.D. Heiskell's customers.  Fifth, J.D. Heiskell wanted to "move up the food chain," selling to persons that it previously competed with, and thereby increasing its own margins.

93.     Todd Gearheart, J.D. Heiskell, and Ray Gearheart encouraged and aided Frank Dores' breach of fiduciary duty from the outset.  As noted, documents produced in other litigation show that not later than October 1, 2015, Frank Dores had already reached an illicit agreement to resign in unison and form a competing distribution channel for inert fats.  (*See, e.g.,* Ex. A-3.)  It would have been nonsensical for Frank Dores and Ray Gearheart to resign from Plaintiffs' employ absent a secured source for inert fats and buy-in from J.D. Heiskell because the vast majority of their income was derived from the sale of Wawasan products to Plaintiffs' customers.

94.     E-mail correspondence obtained from J.D. Heiskell shows that even before the Former Representatives resigned, Ray Gearheart, working with his son Todd Gearheart, successfully transferred a substantial part of J.D. Heiskell's business from Plaintiff Energy Feeds to the competing distribution channel.   (*See, e.g.*, Ex. A-7, A-13.)  Ray Gearheart had agreed to be the Bunnett Parties' agent, representing the Bunnett Parties' products on an exclusive basis and providing the Bunnett Parties' market information and market intelligence, and Ray Gearheart was compensated accordingly.  Ray Gearheart acted as the Bunnett Parties' agent in negotiating the terms of customers' orders, including price, date, and quantity.   This agent-principal relationship between Ray Gearheart and the Bunnett Parties existed until the time that Ray Gearheart tendered his resignation to the Bunnett Parties; prior to his resignation, Ray Gearheart provided no indication to the Bunnett Parties that he had terminated the agency relationship.

95.     Despite the Gearhearts' knowledge of this agency relationship and Energy Feeds' exclusive distribution agreement with Wawasan, J.D. Heiskell induced and participated in Ray Gearheart's breach of fiduciary duty.   In fact, Todd Gearheart, on behalf of J.D. Heiskell, promised Ray Gearheart before he had resigned that J.D. Heiskell would continue buying product through Ray Gearheart.   On information and belief, and common sense, this was a key

inducement for Ray Gearheart and Frank Dores and others when deciding whether to carry out the creation of a new distribution channel.

96.     Ray Gearheart had agreed to represent exclusively the Bunnett Parties' products and to act as the Bunnett Parties' agent for negotiating terms for the sale of the Bunnett Parties' products.  Despite the duties he owed to the Bunnett Parties as their agent, Ray Gearheart secretly worked to enrich J.D. Heiskell at the Bunnett Parties' expense.  In the fall of 2015, Ray Gearheart induced Energy Feeds to substantially reduce the prices Energy Feeds charged to J.D. Heiskell-Idaho.  Ray Gearheart induced Energy Feeds to do so by providing false market information and by telling Energy Feeds that lower prices were essential to persuade J.D. Heiskell-Idaho to continue to purchase exclusively from Energy Feeds.  In October 2015, Todd Gearheart assured Energy Feeds that J.D. Heiskell-Idaho was still purchasing exclusively from Energy Feeds and had no plans to begin purchasing elsewhere, and he affirmed what he has described in his previous trial testimony as a handshake deal with Energy Feeds to continue dealing exclusively with them for inert fats.

97.     At the time that Todd Gearheart provided these assurances and affirmed the parties' handshake agreement in October 2015, both he and his father Ray Gearheart knew that his statements to the Bunnett Parties were false.  Todd Gearheart, with Ray's assistance, already had reached agreement with Gareth Cheong of Wawasan to cut out Energy Feeds as the distributor of Wawasan's products, and J.D. Heiskell-Idaho already had begun placing orders directly with Wawasan.  J.D. Heiskell induced Ray Gearheart to participate in this deception of Energy Feeds in breach of his duties as agent, persuading Energy Feeds to cut J.D. Heiskell-Idaho's prices in reliance on a handshake promise Ray Gearheart knew to be false and concealing from Energy Feeds the fact that, with Ray Gearheart's active participation and support, J.D. Heiskell-Idaho was placing direct orders with Wawasan in breach of the exclusive distribution agreement between Wawasan and Energy Feeds.

98.     Similarly with respect to Natural Soda, even before Ray Gearheart resigned, on information and belief, he and J.D. Heiskell worked together on negotiations for J.D. Heiskell to purchase directly from Natural Soda rather than through Bunnett & Company.  And again, J.D.

Heiskell was well aware of the agency relationship between Ray Gearheart and Bunnett & Company and the exclusive distribution agreement between Bunnett & Company and Natural Soda. J.D. Heiskell encouraged Ray Gearheart to conduct these negotiations on behalf of J.D. Heiskell and for J.D. Heiskell's benefit.

99. On information and belief, Ray Gearheart's activities on behalf of J.D. Heiskell were part of a broader agreement between the Gearhearts and J.D. Heiskell. The Gearhearts promised in essence that they'd take care of J.D. Heiskell and that J.D. Heiskell would in turn take care of the Gearhearts. The Gearhearts ensured that J.D. Heiskell had the most reliable supply at the best prices, protected it from competition, and informed it of competitor's margins. And in return, J.D. Heiskell ensured that the Gearhearts were well compensated and took the steps necessary to ensure that the favored relationship continued.

100. Beginning before Ray Gearheart, Dores, and Franklin resigned from Plaintiffs' employ, Ray Gearheart and Todd Gearheart told divisions of J.D. Heiskell and other customers that Plaintiffs were going out of business, would likely end up in bankruptcy and that Wawasan would be selling direct to customers in the near future. All J.D. Heiskell divisions stopped or significantly reduced their purchases from Plaintiffs' as a result of Frank Dores' and the Gearhearts' commercial disparagement.

101. One aspect of this commercial disparagement and further evidence of the lengths this enterprise will take to carry out its plan, is an explanation contrived by Todd Gearheart to explain why he caused J.D. Heiskell-Idaho to stop purchasing product from Energy Feeds. After Ray Gearheart and the other Former Representatives resigned, an Energy Feeds employee emailed Todd Gearheart explaining that further orders were temporarily on hold. Todd Gearheart claims that he somehow interpreted that statement to mean that Energy Feeds had "cut-off" J.D. Heiskell-Idaho and would not do business with it anymore. (See Ex. A-15.) This was false. When Energy Feeds immediately clarified the situation and reaffirmed its interest in doing business with J.D. Heiskell-Idaho, Todd Gearheart continued to claim that Energy Feeds had cut him off and had refused to do business with him. Todd Gearheart went to so far as to claim that it "Takes a special kind of stupid to burn a bridge like this. Either one of your companies will no

1  longer do business with us going forward."  Todd Gearheart then repeated this story of J.D.

2  Heiskell-Idaho being "cut off" to the other divisions of J.D. Heiskell and other Bunnett Party

3  customers.

4      102.    For example, J.D. Heiskell and the Gearhearts solicited one of Plaintiffs'

5  customers, Dewco, Inc., and then, through commercial disparagement, were able to irreparably

6  harm Plaintiffs' relationship with Dewco by misrepresenting to Dewco that Plaintiffs had "cut-

7  off" J.D. Heiskell from the supply of Wawasan inert fats.  The Gearhearts further communicated

8  to Dewco that Frank Dores was not actually sick.  (*See* Ex. A-16.)  This underscores not only an

9  extraordinary level of corruption internally within J.D. Heiskell, but that similar corruption was

10  pervasive in its relationships with customers.  That J.D. Heiskell could *retain* a customer by

11  revealing to that customer that it and the Gearhearts were working in collaboration with someone

12  who was committing disability benefits fraud as part of a scheme to conceal his breach of

13  fiduciary duty to his former employer, is a clear indication of the broad acceptance of criminal

14  conduct among Defendants and their associates.

15      103.    On information and belief, the Gearhearts told other customers that Plaintiffs were

16  on the brink of insolvency and spread further rumors with the intent to harm the Bunnett Parties.

17      104.    Despite the unambiguous evidence and J.D. Heiskell's own corporate

18  representative's testimony that no evidence existed whatsoever that Energy Feeds had "cut off"

19  J.D. Heiskell-Idaho, Todd Gearheart has continued to repeat his nonsensical and false claim of

20  being "cut off" in sworn testimony at deposition and trial.  At an evidentiary hearing in July 2017

21  regarding whether Todd Gearheart and others should be held in contempt for violating temporary

22  restraining orders, Todd Gearheart testified under oath and his counsel offered argument that

23  Energy Feeds had "cut-off" J.D. Heiskell-Idaho and refused to supply it product.  J.D. Heiskell's

24  representative attending trial in the gallery did nothing to stop or to correct J.D. Heiskell's Vice

25  President's perjury.

26  **The Importance of Concealment During the Key Transition Period**

27      105.    As noted, Frank Dores discussed with Natural Soda the fact that he, Ray

28  Gearheart, and John Franklin were planning to resign and establish a competing distribution

1   channel no later than October 1, 2015.  Frank Dores, John Franklin, and Ray Gearheart engaged

2   an attorney to conduct joint negotiations regarding a commissioned sales agent agreement with

3   Natural Soda.  In early November 2015, following extensive negotiation regarding the terms of

4   the commissioned sales agent agreement, Frank Dores backed out of the negotiated agreement

5   with Natural Soda citing litigation risk.

6       106.   Even after backing out of a formal agreement, Natural Soda and Frank Dores

7   continued to negotiate regarding an under the table agreement.  Frank Dores discussed with

8   Natural Soda a potential arrangement where Natural Soda would compensate him with a

9   "backend sourcing fee" or pay his wife for services that he would in fact render.  (Exs. A-20, A-

10  21.)

11      107.   For their part, both Wawasan and Natural Soda have claimed that Frank Dores

12  threatened them with disrupting customer relationships and attempting to port customers to other

13  suppliers and that is why they engaged in the discussions with Frank Dores about potentially or

14  actually paying him under the table.  Wawasan and the Defendants obviously believed that their

15  new, alternative distribution and its attendant advantages were at risk.  They took elaborate steps

16  to protect this distribution channel and maintain its secrecy.  This was extremely important to the

17  new distribution channel because an interruption by litigation or otherwise could have permitted

18  the Bunnett Parties or others to forestall or stop the tortious conduct of the enterprise.

19  **Defendants' Conceal their Efforts to Establish an Alternative Distribution Channel**

20      108.   The Defendants and other members of the enterprise took elaborate steps in an

21  effort to conceal their misconduct and the Defendants' scheme.  On October 12, 2015, Frank

22  Dores informed William Bunnett that he was taking a few days' vacation because of alleged

23  stress.  (Ex. A-4.)  The next day, Frank Dores incorporated FM Ag, Enterprises, Inc., a California

24  corporation, while he simultaneously applied for disability benefits from the State of California

25  because of supposed acute stress.  (Ex. A-5.)  Dores has provided repeated sworn testimony that

26  this business was his wife's real estate appraisal business, but in fact in private communications

27  with his business contacts he described FM Ag Enterprises, Inc. as his own business and arranged

28  to receive payments through this business for services he provided personally that were entirely

1    unrelated to his wife's appraisal business.  (*See* Ex. A-23.)  Indeed, the board minutes indicate

2    that Frank Dores would receive a substantial salary, whereas his wife would not receive any

3    salary, and the board minutes appointed Frank Dores as the president of FM Ag Enterprises, Inc.

4    rather than his wife.  (Ex. A-5.)

5         109.    On October 19, 2015, while still claiming to be too sick to work, Frank Dores

6    intentionally wiped the memory from his work laptop after having copied numerous confidential

7    documents to an external drive.  An expert witness has confirmed in report and testimony that it

8    would have been impossible for Frank Dores to have wiped the memory inadvertently.  Frank

9    Dores has nonetheless testified repeatedly that the deletion was inadvertent.  (*See* Ex. A-8.)

10        110.    On October 23, 2015, Frank Dores resigned as Plaintiffs' General Manager.  Frank

11   Dores used the same claims of disability to explain his resignation from Plaintiffs' employ and to

12   conceal his competitive activities, even going so far as to submit a fraudulent disability claim to

13   the State of California and collect disability benefits, all the while secretly working in concert

14   with J.D. Heiskell's Todd Gearheart, J.D. Heiskell, Ray Gearheart, and others to establish the

15   competing distribution channel. Indeed, Frank Dores has claimed to have suffered from disabling

16   stress beginning on October 8, 2015, despite volumes of documentary and testimonial evidence

17   showing his ongoing business activities during October and November 2015 related to the

18   alternative distribution channel.  For example, during November 2015, Frank Dores solicited

19   numerous Bunnett Party' customers on behalf of the new, competing distribution channel, as

20   detailed in the depositions of Wei K. Yong-Su and Frank Dores, as well as the Frank Dores' trial

21   testimony before the United States District Court for the Western District of Texas and the United

22   States Bankruptcy Court for the Eastern District of California.  (*See also* Ex. A-27.)

23        111.    The Gearhearts and J.D. Heiskell were well aware of Frank Dores' phony

24   disability claim and how Frank Dores was using the claim of disability to conceal the Defendants'

25   tortious conduct and to frustrate the Bunnett Parties' legal remedies.  In e-mail correspondence on

26   his J.D. Heiskell company account, Todd Gearheart and Ray Gearheart discussed that Frank

27   Dores' claim of disability caused by stress was a litigation defense Frank Dores in case he was

28   sued by the Bunnett Parties for his misconduct.   The Gearhearts have stated in e-mail

1    correspondence and have testified that they thought at the time that Frank Dores' disability claim

2    was fake.  (*See* Exs. A-9, A-16.)

3        112.    The Defendants took elaborate steps to similarly conceal the source of Wawasan

4    product being imported to the United States.  On October 1, 2015, Wawasan caused Palmolyn to

5    be incorporated as an importer of Wawasan product into the United States.  On information and

6    belief, the sole purpose of incorporating Palmolyn was to create a front "manufacturer" so that

7    Wawasan product did not appear on shipping records.  Palmolyn itself lists a personal residence

8    as its registered office, has no known business offices, warehouses, or manufacturing facilities.

9    The name of its registered agent appears to be a combination of street names and not the name of

10   any actual person.  For several months surrounding the Former Representatives' resignations,

11   shipping records show that Palmolyn rather than Wawasan shipped inert fat product to Agrofin in

12   the United States.  Deposition testimony from multiple witnesses has confirmed that the product

13   ostensibly manufactured by Palmolyn and shipped to Agrofin in the United States was in fact

14   Wawasan product.  From a review of shipping and port records, it does not appear that Palmolyn

15   ever shipped any product to the United States other than to Agrofin.

16       113.    Furthermore, Agrofin and J.D. Heiskell initially imported Wawasan product to its

17   alternative United States distribution channel indirectly through Canada.  Wawasan and Agrofin

18   imported the product through Canada despite the fact that a large United States port is located

19   near J.D. Heiskell and Agrofin and is used regularly for the importation of product.  It is apparent

20   that the actual purpose of importing through Canada at the outset was to conceal the origin of the

21   product and thereby conceal Defendants' illicit plans and interference with the exclusive

22   distribution agreement between Energy Feeds and Wawasan.

23       114.    The Defendants used further subterfuge to sell directly to Plaintiffs' customers.

24   For instance, Ray Gearheart arranged for unlabelled bags of product to be delivered to a major

25   customer of Plaintiffs.   Another customer's truck had to wait for hours at the Agrofin warehouse

26   while Wawasan labels were removed from product bags and replaced with phony labels before

27   the truck was allowed to take the product from the warehouse. There is no legitimate explanation

28   for why unlabelled product bags or product bags with phony names were used.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

THIRD AMENDED COMPLAINT

115.     Invoices sent between the Defendants and other members of the scheme were intentionally vague and misleading, providing descriptions of services disconnected from reality. Some of the members of the scheme used aliases, i.e. fake names, even in their communications with one another.  For example, Yap Wai Joon is one of Wawasan's principals.  He commonly goes by the name "Mojo Yap" in his business communications and personal correspondence. However, when Yap Wai Joon conducted business on behalf of Paros, he used the names "Wesley Yap," or "Ronald Zhang."  He even signed formal invoices and documents on behalf of Paros using the fake names of Wesley Yap and Ronald Zhang.  This is further detailed in the deposition transcripts of Cheong and Yap taken in connection with the contempt proceedings before the United States District Court for the Western District of Texas.

116.     Frank Dores and Ray Gearheart were compensated for their efforts related to the alternative distribution channel in a manner designed to conceal the source and nature of the service rendered.  Wawasan apparently caused its affiliate, Paros, to provide startup funding to Agrofin in the form of an undocumented loan.  On information and belief, Wawasan sent the funds in this manner to conceal the source of the funds.  Similarly, Ray Gearheart and Franklin received about the first six months of their compensation for selling Wawasan products from Paros instead of from Wawasan or Agrofin.  Agrofin would then in turn invoice Palmolyn.  As explored during depositions of Wei K. Yong-Su, Cheong, and Yap, all of the business relationships between and among the various Wawasan Affiliates were apparently undocumented, oral agreements.

117.     Paros made at least one payment to Frank Dores' company, FM Ag Enterprises, Inc. for services that Frank Dores performed on behalf of the alternative distribution channel. Wawasan and Frank Dores created a fake paper trail to conceal the true purpose of the payment, concocting the story that the payment was for services that Frank Dores' wife performed on behalf of Paros.  (*See* Ex. A-22.)  Wawasan's executives and even Frank Dores have now admitted the obvious, that the impetus for the November payment related to Frank Dores rather than to his wife.  In other words, they have now admitted that they created a fake invoice in order to paper the record.

118.    These elaborate concealment measures were undertaken because Defendants and Wawasan knew they were committing tortious acts and sought to conceal those acts and the scope of their misconduct from Plaintiffs.  More shocking, Defendants engaged in an elaborate payment scheme and committed crimes to further their illicit plans and conceal their wrongdoing.

**The Frank Dores Litigation and the Illicit Payment Scheme**

119.    An integral part of the planned alternative distribution channel was Frank Dores. Frank Dores and the other Former Representatives solicited Plaintiffs' customers on behalf of J.D. Heiskell and Wawasan before and continuing after their resignations from the Bunnett Parties' employ.  The scheme was only briefly disrupted when Plaintiffs filed suit against Frank Dores and obtained a temporary restraining order against him in Travis County, Texas.

120.    Two separate courts entered Temporary Restraining Orders against Dores as a result of this litigation. The first Temporary Restraining Order was entered on November 24, 2015.  The second Temporary Restraining Order was entered on January 13, 2016.  Both Temporary Restraining Orders enjoined Dores, as well as those parties with knowledge of the Temporary Restraining Order working in concert with Dores, from directly or indirectly soliciting or forming any contractual or other business relationship with any customer or supplier of the Plaintiffs.

121.    On January 13, 2016, at an evidentiary hearing before the United States District Court for the Western District of Texas, the Court noted on the record that it appeared Frank Dores was attempting to commit a "fraud upon the Court" and that Dores' sworn statements "look like perjury to me. And I don't mean to select mistakes or oopses or false statements. They look like perjury."  (Ex. A-37.)  Frank Dores' sworn statements included that he was disabled due to stress and therefore unable to work or travel.

122.    On January 22, 2016, Frank Dores petitioned for bankruptcy.  (Ex. A-43.)  Despite the temporary restraining orders and petitioning for bankruptcy because of an alleged disability, Frank Dores continued to perform work on behalf of the alternative distribution channel.

123.    Dores was compensated for his role in the scheme through a series of under the table payments.  The first known payment was $20,000, and the payment was made from

Wawasan's affiliate, Paros, to Frank Dores' company, FM Ag Enterprises, Inc., on November 17, 2015.  The second and third known under the table payments to Frank Dores occurred in January and March of 2016, respectively.[2]   Specifically, Wawasan requested that Todd Gearheart's company send Wawasan "vague invoices" for organizing a "research study." Wawasan made payment to Todd Gearheart's company, E&K Ag LLC, via international wire transfer.   Todd Gearheart of J.D. Heiskell then wrote checks to Teresa Miranda (Dores' grandmother), Jose Hernandez (his friend and neighbor), and Marcio Relva (his brother-in-law), who in turn were told to pay the monies to Dores.  Dores contacted the recipients of the funds to tell them to expect the money and that the checks were for him.  Ray Gearheart obtained the names of the friends and family and communicated that information to Todd Gearheart.  Wawasan, Ray Gearheart, Todd Gearheart, and J.D. Heiskell engaged in this behavior despite the existence of the temporary restraining orders and their knowledge that Frank Dores had filed for bankruptcy.  Indeed, their email communications discuss the temporary restraining order, the bankruptcy, and the fact that they were attempting to conceal the payments from Plaintiffs.  And it was of course already known to the Gearhearts that Frank Dores was asserting a claimed disability defense and had applied for benefits from the State of California based on that claimed disability.

124.    Dores did not disclose the Wawasan payments in his bankruptcy schedules.  In fact, on June 16, 2016, Frank Dores made a false declaration about the payments in the bankruptcy case. Frank Dores sworn declaration stated that he had not "requested or received, directly or indirectly any payment or anything of value" from Wawasan.  (Ex. A-52.)  The declaration is demonstrably false: Mary Dores, Jose Hernandez, and Marcio Relva have all testified that Frank Dores contacted them and requested their assistance in accepting the checks on his behalf.  And of course, if Frank Dores truly had not requested or did not desire the funds,

---

[2] Documentary evidence detailing the mechanics of the payments, the dates of the payments, and some of the discussions related to these January and March 2016 are located at Exhibits A-35, A-36, A-39, A-40, A-41, A-42, A-48, and A-49.  Todd Gearheart's banking records showing receipt of the Wawasan wire payments and copies of the checks written by Todd Gearheart to Frank Dores' friends and family are located at Exhibit A-51.

he could have simply not provided to Ray Gearheart the names and contact information of his friends and family that were to receive the funds on his behalf.

125.    Dores also swore that he had not directly or indirectly participated in the marketing, sale, or purchase of nutritional supplements for dairy cows since January 1, 2016. Those statements are also demonstrably false. For example, on January 5, 2016, Ray Gearheart emailed a potential supplier of product, copying Todd Gearheart, and stated that Ray, Dores, and Franklin were in business together and were interested in selling to customers that they developed while working for Plaintiffs.  (*See* Ex. A-34.)  This was a potential new supplier, introduced by J.D. Heiskell to the members of the alternative distribution channel.

126.    Moreover, other email correspondence involving Ray Gearheart, Todd Gearheart, Wawasan, and Cheong referring to Frank Dores as "Frank," "F," or "FD," shows that Dores solicited customers on behalf of Wawasan continuing further into 2016.   Similar e-mail communications during March 2016 show Frank Dores soliciting customers on behalf of the alternative distribution channel.  (*See* Exs. A-46, A-50.)

**The Alternative Distribution Channel's Operations**

127.    The Defendants and the other members of the enterprise succeeded in creating an alternative distribution channel.   The alternative distribution channel was comprised of J.D. Heiskell, the Gearhearts, E&K Ag, Gearheart Ag, Frank Dores, the Wawasan Affiliates, and John Franklin.  Wawasan manufactured the product and shipped it primarily to either J.D. Heiskell or to Agrofin.  Agrofin had no experience in the industry and depended upon the other members of the enterprise.  Ray Gearheart, Frank Dores, and John Franklin acted as sales representatives for the alternative distribution channel.   Todd Gearheart and J.D. Heiskell acted as a distributor, selling product to the Bunnett Parties' former customers, J.D. Heiskell's ordinary customer base, and new customers.

128.    The alternative distribution channel was briefly interrupted by the Bunnett Parties' litigation filed against Frank Dores.  Originally, Frank Dores was supposed to have a larger role in the alternative distribution channel.  As a result of the litigation against Frank Dores, however,

Ray Gearheart took on more responsibility in the alternative distribution channel, responsibilities that were supposed to have been Frank's.  (*See* Ex. A-33.)

129.    The Defendants and their coconspirators were able to successfully establish an alternative distribution channel for the United States market and grow that distribution channel. Defendants successfully cut out Energy Feeds and Bunnett & Company, misappropriated their sales force and customers, and grew their alternative distribution channel within the United States.  Following termination of the distribution agreement between Wawasan and Energy Feeds in mid-November 2015, Defendants took further illicit action to conceal and continue the scheme.

130.    The Defendants' misconduct caused substantial harm to Energy Feeds and Bunnett & Company.  With respect to Energy Feeds, Energy Feeds was forced to compete against its former exclusive supplier's new distribution channel, which was comprised of Plaintiffs' own largest customer, former sales representatives, and former general manager.    Absent the Defendants' misconduct and tortuous interference, Wawasan would not have terminated its exclusive distribution agreement with Energy Feeds.  While the harm to Energy Feeds has been substantial and continues to accrue, J.D. Heiskell has benefitted substantially by its misconduct.

131.    Ray Gearheart has benefitted J.D. Heiskell by using his control over the new distribution channel to J.D. Heiskell's advantage.  Ray Gearheart has diverted business to J.D. Heiskell and ensured that other persons selling Wawasan product do not sell directly or indirectly to J.D. Heiskell customers.  Ray Gearheart also has shared market intelligence with J.D. Heiskell, including what J.D. Heiskell's competitors are paying for product.    Ray Gearheart has also ensured that J.D. Heiskell receives the most favorable pricing among Wawasan's customers in the western United States, thereby insulating J.D. Heiskell from competition.

132.    Ray Gearheart also assists J.D. Heiskell in unfairly allocating customers resulting in competitive harm to Energy Feeds and customers.  Agrofin entered the dairy cow feed fat market as a distributor of inert fat product in the fall of 2015 and began soliciting orders from feed mills and other resellers, and for direct sales to dairies. Some of the feed mills, resellers, and dairies Agrofin approached were customers of J.D. Heiskell. J.D. Heiskell learned about Agrofin's solicitation of and sales to its customers and complained to Wawasan. To protect J.D.

Heiskell and Agrofin from the effects of competition, Wawasan, J.D. Heiskell, Agrofin, and a smaller reseller, Dewco, Inc., agreed to stop selling Wawasan products to each other's customers. At first, Dores was to act as a "traffic cop" managing these issues and deciding what sales Agrofin and J.D. Heiskell could make to whom, but Ray Gearheart apparently stepped into that role after Plaintiffs filed suit against Frank Dores.  Put simply, the enterprise unfairly and unlawfully allocated customers between themselves causing competitive harm.

**Natural Soda Wrongfully Terminates its Exclusive Distribution Agreement with Bunnett & Company**

133.    Against this backdrop, the plan to harm Bunnett & Company simultaneously came to fruition when its exclusive supplier, Natural Soda, terminated the parties' supply agreement in December of 2015.  The deterioration of the relationship between Bunnett & Company and its supplier partially caused by Dores' and Ray Gearheart's breaches of fiduciary duty and J.D. Heiskell's participation in those breaches created a perception of turmoil, negatively impacted Bunnett & Company's ability to deliver product, and harmed Plaintiffs' reputations.  Defendants' knowing participation in Frank Dores' and Ray Gearheart's breaches of fiduciary duty caused substantial harm to Bunnett & Company.  Because Energy Feeds and Bunnett & Company share many of the same customers, any harm to Bunnett & Company's customer relationships foreseeably caused harm to Energy Feeds' customer relationships and vice versa.  On information and belief, Defendants intentionally sought to harm both Energy Feeds and Bunnett & Company, in an effort to injure Plaintiffs' customer goodwill and business reputation and thereby gain an unfair competitive advantage.

134.    As noted, Ray Gearheart and Todd Gearheart both interfered with the contractual relationship between Natural Soda and Bunnett & Company.  They were aware of the exclusive distribution agreement and yet made numerous overtures to Natural Soda both indicating their desire to purchase directly from Natural Soda rather than through Bunnett & Company and also defaming the Bunnett Parties to Natural Soda.  J.D. Heiskell and Ray Gearheart intentionally

1    engaged in this conduct to induce Natural Soda to terminate its exclusive distribution agreement

2    with Bunnett & Company.

3         135.    After Natural Soda wrongfully terminated its distribution agreement with Bunnett

4    & Company in December 2015, Bunnett & Company filed suit and obtained a temporary

5    restraining order against Natural Soda that enforced Bunnett & Company's exclusivity rights.

6    During the term of the temporary restraining order, Natural Soda was prohibited from doing

7    business with Bunnett & Company's customers who had not previously refused to do business

8    with Bunnett & Company.  J.D. Heiskell was aware of the temporary restraining order and in fact

9    entered into supply agreements with Natural Soda the evening that Bunnett & Company filed suit

10   but before the temporary restraining order was ordered the following day.  J.D. Heiskell therefore

11   knew that there was potential that a temporary restraining order or injunction could impact their

12   ability to retain a consistent source of product.  These issues were explored in detail at depositions

13   of J.D. Heiskell's officers, including Todd Gearheart, Rick Bowen, and Tom Sigler.  Following

14   an evidentiary hearing, the court later entered an order of criminal contempt against Natural Soda

15   for intentionally violating the temporary restraining order.

16        136.    As a consequence of Natural Soda's wrongful termination and in order to seek

17   relief for Natural Soda's breaches of the Natural Soda NDA induced by Defendants, Bunnett &

18   Company was required to prosecute its claims against Natural Soda for the breaches induced by

19   Defendants.  Following a jury trial in January 2017, Bunnett & Company obtained a judgment

20   against Natural Soda, which judgment is currently on appeal.  The jury found that Natural Soda

21   breached and wrongfully terminated the Natural Soda EDA.

22   **Further Joint-Venture Discussions**

23        137.    As noted, J.D. Heiskell and Energy Feeds had discussions during 2014 regarding a

24   potential joint venture or J.D. Heiskell purchasing an interest in Energy Feeds. J.D. Heiskell has

25   also conducted joint venture or buyout discussions with both Wawasan and Natural Soda during

26   2016 and likely continuing to the present.  J.D. Heiskell, Wawasan, and Natural Soda also

27   apparently discussed a three-way joint venture between them for the distribution of product

28   within the United States market.  At depositions, J.D. Heiskell's officers testified that these

1    discussions were put on hold until the litigation between these various entities and the Bunnett

2    Parties concluded.  Any such joint venture or buyout between J.D. Heiskell, Wawasan, and/or

3    Natural Soda would further exacerbate the competitive harms already experienced by the Bunnett

4    Parties.

5    **Post-Complaint Developments**

6        138.    Since the Plaintiffs filed their initial complaint on March 17, 2017, there have been

7    a number of developments relevant to this suit.  First, there has been a trial in the Bankruptcy

8    Court for the Eastern District of California regarding Plaintiffs' motion to dismiss Frank Dores'

9    bankruptcy for fraud and bad-faith.  The bankruptcy court dismissed Frank Dores' bankruptcy

10   case for fraud and bad-faith.  Second, there has been an evidentiary hearing in the United States

11   District Court for the Western District of Texas regarding Plaintiffs' motion for contempt of court

12   involving some of the same defendants named in this suit.  The district court held Frank Dores,

13   Ray Gearheart, and Todd Gearheart in contempt of court.  Third, Plaintiffs reached a confidential

14   settlement with the Wawasan related Defendants, and Plaintiff Energy Feeds has resumed a

15   commercial relationship with Wawasan.  During the course of those other proceedings, either

16   through deposition or trial, Plaintiffs have examined under oath Frank Dores, Wawasan, Gareth

17   Cheong, Yap Wai Joon, Wei K. Yong-Su, Agrofin, Ray Gearheart, and Todd Gearheart,

18   providing new testimony and information that was unavailable to the Plaintiffs at the time they

19   filed their initial complaint.

20       139.    First, on June 7, 2017, the Bankruptcy Court for the Eastern District of California

21   (the "Bankruptcy Court") dismissed Frank Dores' bankruptcy case for cause and with prejudice

22   and barred him from commencing any new bankruptcy case for 180 days from the date the

23   dismissal order becomes final. (*See* Order Dismissing Chapter 13 Case, *In re Dores*, 16-bk-

24   10169, ECF No. 400; Memorandum Decision on Bunnett & Company and Energy Feeds

25   International, LLC's Motion to Dismiss Case ("Opinion"), *In re Dores*, 16-bk-10169, ECF No.

26   404, attached as Exhibit A-55.)  As detailed in the Bankruptcy Court's Opinion, the Bankruptcy

27   Court dismissed Frank Dores' bankruptcy case in substantial part because of Dores' concealment

28   of the payments described above. The Bankruptcy Court also found that Dores made

1    misrepresentations to the Bankruptcy Court regarding his capacity for gainful employment.  On

2    these grounds, the Bankruptcy Court found Frank Dores guilty of "numerous instances of

3    egregious conduct coupled with bad faith." (*See* Ex. A-55.)  Further detail is contained in the trial

4    transcripts, which are in the public record, and the exhibits admitted at trial.

5        140.    Second, beginning on July 24, 2017, the United States District Court for the

6    Western District of Texas held a trial on Bunnett & Company's and Energy Feeds' Motion for

7    Contempt against the Gearhearts and Frank Dores.  Among others, Ray Gearheart, Todd

8    Gearheart, and Frank Dores testified.  Each of these persons provided incredible testimony.  For

9    instance, Todd Gearheart repeated his assertion discussed above that Energy Feeds had somehow

10   "cut off" J.D. Heiskell-Idaho.  Todd Gearheart further admitted that his verified interrogatory

11   answer stating that he had no notice of the November 24, 2015 temporary restraining order

12   against Frank Dores was false.  Todd Gearheart admitted that he in fact did have notice of the

13   temporary restraining order and that he had forwarded that information to other executives at J.D.

14   Heiskell, but that J.D. Heiskell took no action to advise Todd Gearheart about any obligations

15   under the temporary restraining order.  Ray Gearheart provided incredible testimony that the

16   payments made to Dores in January and March of 2016 were a charitable gift without a business

17   purpose.   Frank Dores repeated the same falsehoods regarding his capacity for gainful

18   employment and contact with persons in the industry after his resignation that multiple courts

19   have strongly suggested were perjuries and were a principal reason that his bankruptcy case was

20   dismissed.  (*See* Ex. A-56.)

21       141.    On March 6, 2018, the Magistrate Judge Austin issued the court's Report and

22   Recommendation, recommending that Todd Gearheart, Ray Gearheart, and Frank Dores all be

23   held in contempt of court, ordered to disgorge the illicit payment and pay Plaintiffs' attorneys'

24   fees and expenses, and making express findings that each of Frank Dores, Todd Gearheart, and

25   Ray Gearheart lacked credibility.  (*Bunnett & Company, Inc. v. Frank Dores et al*, 15-cv-1104,

26   ECF No. 216, attached as Exhibit A-57.)  On March 29, 2018, District Judge Yeakel of the

27   United States District Court for the Western District of Texas adopted the Report and

28

1    Recommendation.  (*Bunnett & Company, Inc. v. Frank Dores et al*, 15-cv-1104, ECF No. 221,

2    attached as Exhibit A-58.)

3        142.    Third, the Wawasan Affiliates and the Bunnett Parties have entered into a

4    confidential settlement agreement and have partially resumed a business relationship but under

5    different terms and reduced scope compared to the prior exclusive distribution agreement (the

6    Wawasan EDA) that Wawasan terminated in November 2015.  J.D. Heiskell is still buying

7    product directly from Wawasan.

8        143.    As a result of Wawasan's wrongful termination and other disputes between the

9    parties, Energy Feeds and Wawasan arbitrated claims against one another in Singapore before the

10    Singapore International Arbitration Centre.  In that arbitration, among other claims, Energy Feeds

11    had asserted claims that Wawasan had wrongfully terminated the Wawasan EDA and had

12    breached the Wawasan EDA by planning to distribute and distributing product to Energy Feeds'

13    customers in the United States in breach of the agreement's exclusivity provisions.  The parties

14    reached a confidential settlement of those claims.

### CAUSES OF ACTION

### COUNT ONE
**Violations of the Racketeer Influenced and Corrupt**
**Organizations Act ("RICO") 18 U.S.C. § 1962(c)**
*All Plaintiffs v. All Defendants*

19        144.    Plaintiffs hereby re-allege and incorporate by reference herein, as if set forth in

20    full, the allegations set forth above in all paragraphs.

21        145.    The Defendants undertook a variety of criminal acts in order to carry out and

22    conceal their scheme to establish, maintain, and grow a new, competing distribution channel.  By

23    its nature, this scheme has been organized and carried out in secret, and the Defendants have used

24    elaborate measures to conceal some of the wrongful acts at issue. The conspirators perpetrated

25    this scheme by interstate telephone calls, international bank wire transfers, and interstate email

26    communications.

27

28

**The RICO Enterprise**

146.    Defendants J.D. Heiskell, Todd Gearheart, E&K Ag, Frank Dores, Ray Gearheart, and Gearheart AG, formed an association-in-fact enterprise, joined by the Wawasan Affiliates and John Franklin, and conducted the affairs of an association-in-fact enterprise as defined in 18 U.S.C. § 1961(4).   The current members of the enterprise, referred to hereinafter as the "Gearheart Distribution Channel," are J.D. Heiskell, Todd Gearheart, E&K Ag, Frank Dores, Ray Gearheart, Gearheart Ag, Wawasan, Cheong, and Mojo Yap.

147.    The Gearheart Distribution Channel is a group of persons associated together for the common purpose of establishing and propagating a distribution channel for inert fat products within the United States.   The members of the Gearheart Distribution Channel work in concert and as part of a continuing unit.   The current leaders of the Gearheart Distribution Channel are J.D. Heiskell, Todd Gearheart, Ray Gearheart, Gearheart Ag, Frank Dores, Cheong, Mojo Yap, and Wawasan; the leaders work together in making decisions with respect to distribution of inert fats within the United States market and direct the activities of the individual members of the enterprise and the enterprise itself.   E&K Ag is a current member and associate of the Gearheart Distribution Channel that indirectly manages the affairs of the enterprise.   Agrofin, Wei K. Yong-Su, Paros, Palmolyn, and John Franklin are former members of the enterprise that are no longer actively involved in the management of the enterprise.   Each of the members of the Gearheart Distribution Channel are persons within the meaning of 18 U.S.C. § 1961 because they are capable of holding a legal or beneficial interest in property.

148.    The Gearheart Distribution Channel is an ongoing, continuing group of persons and entities associated together for the common purpose of creating and carrying out a distribution channel for the sale of specialty feed fat and other nutritional supplements within the United States, in part by importing specialty feed fat from Malaysia.   The members of the Gearheart Distribution Channel also engage in individual activities outside of the enterprise. However, the pattern of racketeering activity in this case was conducted by them in concert with each other in a coordinated and organized fashion, in order to carry out the scheme. Their conduct therefore far exceeds that of commonplace and permissible commercial relationships.

149.    While the Gearheart Distribution Channel is distinct from its pattern of racketeering activity, the Gearheart Distribution Channel has collectively engaged in an unlawful pattern of racketeering activity that its individual members working alone could not have accomplished.  The activities of the Gearheart Distribution Channel directly affected foreign and interstate commerce by importing inert fats from abroad and distributing those products throughout the United States.  The Gearheart Distribution Channel has further directly affected foreign and intestate through the pattern of racketeering activity described below.  Many of the predicate acts involve conduct stretching from Malaysia and Singapore into California, Idaho, Texas, and other states.

150.    Each of the members of the Gearheart Distribution Channel have directly and indirectly conducted and participated in the conduct of the enterprise's affairs and have engaged in a pattern of racketeering activity described below, in violation of 18 U.S.C. § 1962(c).

**Predicate Acts**

151.    The enterprise's systematic scheme to establish and maintain an alternative distribution channel was facilitated through a pattern of racketeering activity by perpetrating mail and wire fraud, subornation of perjury, commercial bribery, violations of the Travel Act, concealment of assets and bankruptcy fraud, and money laundering.  These acts set forth below constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).  The criminal conduct and violations set forth below were committed willfully and with actual knowledge that the conduct was unlawful.

Mail and Wire Fraud, 18 U.S.C. §§ 1341, 1343

152.    Defendants carried out their scheme using the mail and wires on numerous occasions in violation of 18 U.S.C. § 1341 and § 1343. By omitting and fraudulently concealing the true nature of the payments to Frank Dores from the bankruptcy court and others, Defendants made false statements using the Internet, telephone, United States mail, and other interstate commercial carriers.  Despite the elaborate steps that the Gearheart Distribution Channel took to conceal these payments to Dores, Plaintiffs have discovered detailed documentary evidence regarding the payment scheme.

153.    On November 17, 2015, FM Ag Enterprises, Inc., Frank Dores' company received a wire payment of $20,000 from Paros, a Singapore corporation with ties to Wawasan.  (Ex. 22.) The method of payment was designed to conceal the purpose of the payment and to enable the Dores, if questioned, to attest that the payment had been made to Frank Dores' wife and not to Frank, just as in fact both Frank Dores and his wife testified to falsely in their bankruptcy proceedings.  Paros also made payments at about the same time to John Franklin and Ray Gearheart, which payments continued for about six months.

154.    On January 13, 2016 Ray Gearheart, Todd Gearheart, and Wawasan's Gareth Cheong discussed Cheong's desire for a "vague invoice" for "product trials" from Todd.  They discussed that the Plaintiffs' lawyers are watching Frank's company (FM Ag Enterprises, Inc.) "like hawks."  Ray Gearheart recommended that after Todd Gearheart receives the wire payment from Wawasan, that Todd Gearheart send 2-3 checks to different people that will then "loan" Frank the money.  Todd Gearheart emailed the phony invoice to Gareth Cheong as requested.

155.    On January 22, 2016, Frank Dores and his wife petitioned for bankruptcy. On January 26, 2016, Mr. Dores asked his cousin to tell Ray Gearheart that he filed for bankruptcy.

156.    On January 26, 2016, Gareth Cheong caused Wawasan to wire $20,000 to Todd Gearheart in Idaho.  Todd Gearheart then mailed checks to Marcio Relva and Angel (Jose) Hernandez in California.  Mr. Dores had previously provided Mr. Relva's and Mr. Hernandez's names and addresses to Ray Gearheart.  Ray Gearheart in turn provided that information to Todd Gearheart.

157.    In the first few days of February, Frank Dores' brother-in-law, Marcio Relva, received a check for $5,000 from Todd Gearheart dated January 27, 2016.  A couple weeks before receipt of the check, Frank Dores approached Marcio Relva and told Marcio that he would receive a check in the mail for Frank.  Likewise, in the first few days of February, one of the Debtors' friends, Angel (Jose) Hernandez, received a check for $15,000 from Todd Gearheart dated January 27, 2016, with the intent to give the money to Frank Dores.  Frank Dores similarly spoke with Angel Hernandez regarding the check before it was sent.

158.   On March 22, 2016, Wawasan, Ray Gearheart, and Todd Gearheart emailed regarding another $20,000 payment to be made from Wawasan to Mr. Dores via international wire transfer and checks written to Mr. Dores' friends and family.  On March 28, 2016, Gareth Cheong caused Wawasan to wire another $20,000 to Todd Gearheart in connection with a second phony invoice issued to Wawasan by Todd Gearheart; Todd Gearheart wrote checks to Mr. Dores' friends and family, who had provided their contact information per instructions from Mr. Dores.  Specifically, $10,000 was sent to Frank Dores' grandmother, Teresa Miranda, and another $10,000 was sent to Mr. Angel (Jose) Hernandez.  Both checks were dated March 30, 2016.

159.   These payments were made in secret to Frank Dores because Wawasan and the Gearhearts knew that the Dores were in bankruptcy, that Frank Dores was receiving disability payments from the state of California, and that Dores was enjoined from working for Wawasan and Plaintiffs' other suppliers and customers. The money was intended to compensate Dores for illicit services that he rendered for Wawasan and to buy his testimony, that otherwise would reveal Defendants' wrongful acts and liability to Plaintiffs, in violation of statute prohibiting the suborning of perjury, California Penal Code 127 PC.

160.   The payments were further made in secret to disguise and conceal the creation and establishment and operation of the Gearheart Distribution Channel.

161.   J.D. Heiskell was a key participant in these under the table payments made in January and March of 2016.  J.D. Heiskell's Todd Gearheart was the one who sent fraudulent invoices to Wawasan and assisted in concealing the subsequent wire transfers, checks, and deliveries of cash to Frank Dores through several layers of intermediaries in order to hide the source and purpose of the payments.  Todd Gearheart used his J.D. Heiskell corporate email account to conduct all of these transactions.  The fact that Todd Gearheart used his company email shows he believed he was acting in the interests of J.D. Heiskell in completing these payments and that, although he sought to conceal the payments from third parties, had no intent, desire, or perceived need to conceal his activities from his own employer either because his employer already had approved or, in the alternative, because he believed his employer would

1    approve of the scheme in which he was engaged and the specific criminal acts he undertook in

2    furtherance of this scheme for the competitive advantage and profit of his employer.

3         162.    Todd Gearheart's concealment was essential to the success of the scheme and

4    thereby to promote the business interests of J.D. Heiskell for at least three reasons.  First, Todd

5    Gearheart and J.D. Heiskell needed to conceal the alternative distribution channel and the scope

6    of their misconduct from the Bunnett Parties in order to frustrate the Bunnett Parties' and their

7    competitors' ability to obtain injunctive relief to prevent or hamper the competing distribution

8    channel.  Second, concealment was necessary to gain Frank Dores' assistance.  Frank Dores

9    repeatedly had expressed his concern about his own personal liability to the Bunnett Parties and

10   his preference to engage in business under the table.  Only through concealment was Frank Dores

11   willing to continue to work with the other Defendants and J.D. Heiskell.  Third, concealment gave

12   J.D. Heiskell and the Defendants a competitive advantage because the Bunnett Parties were taken

13   by surprise by the emergence of a new distribution channel and were unable even to identify their

14   new competitor or the resources at that competitor's disposal or to attempt to respond this new

15   underhanded competitor's stealth entry through the Bunnett Parties' legitimate business retention

16   and development strategies.

17        163.    Dores also committed disability fraud, beginning in October 2015.  Ray Gearheart

18   and J.D. Heiskell's Todd Gearheart concealed and thereby aided Dores' disability fraud, which

19   began in October 2015, as part of their efforts to conceal their misconduct.  Dores' disability

20   fraud and the Gearhearts' participation in it constitutes further predicate acts of mail and wire

21   fraud based on lies submitted in writing via the mails or wires.

22        164.    The mails and wires were used to perpetrate a fraud on the Bunnett Parties by

23   attempting to conceal the payments so that the Bunnett Parties could not enforce their legal rights,

24   a fraud on the bankruptcy court, the United States District Court for the Western District of

25   Texas, Frank Dores' other bankruptcy creditors, and Wawasan's auditors and lender.

26        165.    These acts of mail and wire fraud are predicate offenses constituting "racketeering

27   activity" under RICO, 18 U.S.C. § 1961(1).

28

Subornation of Perjury, California Penal Code § 127

166.   On information and belief, one of the reasons that the Gearheart Distribution Channel and its members secretly transferred funds to Dores in November 2015, January 2016, and March 2016, was in an effort to purchase his testimony.  Dores had the ability to give truthful testimony that would have revealed Defendants' participation in the scheme to destroy Plaintiffs' businesses.  Defendants purchased Dores' silence.  This conduct violates California Penal Code § 127, subornation of perjury, and is punishable by more than one year.  The acts of subornation of perjury and obstruction of justice as described above are also predicate offenses constituting "racketeering activity" under RICO, 18 U.S.C. § 1961(1).

Violation of California Penal Code § 641.3, Commercial Bribery

167.   On information and belief, Wawasan caused Paros to begin making payments to Dores while he was still employed with the Bunnett Parties in order to cause Dores to place product purchases that harmed Energy Feeds and inured to the benefit of Wawasan.  These payments constitute violations of California Penal Code § 641.3, and are punishable for more than one year.  The acts of commercial bribery as described above are also predicate offenses constituting "racketeering activity" under RICO, 18 U.S.C. § 1961(1).

Violation of the Travel Act, 18 U.S.C. § 1952

168.   As alleged herein, Defendants repeatedly used the mail and telephone services in foreign and interstate commerce in carrying out acts of commercial bribery.  Each use of the mail, telephone, and wire transfer to support that scheme violates the Travel Act, 18 U.S.C. § 1952.  These Travel Act violations are also predicate offenses constituting "racketeering activity" under RICO, 18 U.S.C. § 1961(1).

Concealment of Assets and Bankruptcy Fraud, 18 U.S.C. § 152, 18 U.S.C. § 157, and 11 U.S.C. § 548

169.   The conduct of the individual Defendants and the Gearheart Distribution Channel described herein constitutes bankruptcy fraud in violation of 18 U.S.C. §152, 18 U.S.C. §157 and 11 U.S.C. §548 in that the members of the enterprise provided knowing and substantial assistance

to Frank Dores in connection with the secret payments made to him in November 2015, January 2016, and March 2016 and the concealment of those payments from the bankruptcy court.

170.    The Gearheart Distribution Channel knew that the Dores were in bankruptcy, it knew that the payments were unlawful, and it designed the transaction to conceal the nature, location, source, ownership, and control of the proceeds and to avoid reporting the payments to the bankruptcy court. Defendants knowingly devised and participated in a scheme to defraud the bankruptcy court by making a fraudulent invoice for Wawasan to "pay" money to Todd Gearheart's company E&K Ag, LLC. E&K Ag, LLC had not provided any services to Wawasan and, instead, the phony invoice was used to secret money to Frank Dores, outside of the bankruptcy estate, and done with the intent to defraud the bankruptcy court, the Bunnett Parties, and the Dores' other creditors.

171.    Todd Gearheart committed this bankruptcy fraud and concealment of assets in order to benefit his employer and establish and further the Gearheart Distribution Channel. Concealment was essential to J.D. Heiskell for the same reasons set forth above in Paragraphs 160-62.

Money Laundering in Violation of 18 U.S.C. § 1956(a)(1)(A)(i) and § 1956(a)(1)(B)(i)

172.    Defendants violated 18 U.S.C. § 1956 by conducting financial transactions involving the proceeds from unlawful activity, namely Dores' attempt to fraudulently conceal assets in contemplation of bankruptcy or with the intent to defeat the provisions of the bankruptcy code or in committing commercial bribery, and by conducting financial transactions involving unlawful proceeds and seeking to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds.

173.    Todd Gearheart participated in this money laundering in order to benefit his employer and establish and further the alternative distribution channel, which is within the scope of duties J.D. Heiskell employs him to perform.  Concealment was essential to J.D. Heiskell for the same reasons set forth above in Paragraphs 160-62.

1   Perjury and Obstruction of Justice, 18. U.S.C. § 1621 and U.S.C. § 1503

2       174.   In November 2015 and January 2016, Dores committed perjury in affidavits before

3   the United States District Court for the Western District of Texas and the United States

4   Bankruptcy Court for the Eastern District of California.  (*See* Exs. A-37, A-55.)  Dores lied about

5   his relationship and interaction with Wawasan, the other Former Representatives, and J.D.

6   Heiskell, and his other competing business activities.  Dores committed further perjury at

7   deposition during March 2016, at the Section 341(a) Meeting of Creditors, and at trial before the

8   bankruptcy court when he concealed the assets subject of the January 2016 through March 2016

9   payment scheme. (Ex. A-47.)  The other Defendants facilitated this perjury by helping to provide

10  cash to fund Dores' litigation expenses in these proceedings with the understanding and

11  expectation that Dores would use the illicit payments the Gearhearts facilitated in order to conceal

12  the Defendants' misconduct and frustrate the Bunnett Parties' timely and effective remedies;

13  indeed, the Gearhearts have testified at trial that one of the purposes of the payment scheme was

14  to help fund Dores' legal fees in these same proceedings and at the same time he was providing

15  this false testimony.  The Defendants further benefitted by Dores' perjury because Dores kept

16  secret and helped to conceal the workings of the alternative distribution channel during a crucial

17  transition period.  Perversely, the Defendants further benefitted by funding Dores' litigation

18  defense simply by imposing on a competitor the burden and expense of litigation fees and costs

19  that imposed additional cost on a competitor and limited that competitor's ability to compete on

20  price.

21      175.   At the trial beginning on July 24, 2017 before the United States District Court for

22  the Western District of Texas, Frank Dores, Todd Gearheart, and Ray Gearheart each committed

23  perjury.  Frank Dores' perjuries were numerous, including regarding his capacity for gainful

24  employment, his business activities before and after his resignation from the Bunnett Parties'

25  employ, and the purpose of the payments he received from Wawasan.  Even when confronted

26  with documents that directly contradicted his prior verified and sworn statements made under

27  penalty of perjury, Frank Dores affirmed his prior falsehoods.  Todd Gearheart committed perjury

28  in his verified interrogatory responses, which were never corrected or amended before trial, and

1  in which he averred that he had not known about the November or January temporary restraining

2  orders.  Todd Gearheart further committed blatant perjury by again testifying under oath that

3  Energy Feeds had "cut off" J.D. Heiskell-Idaho.  Ray Gearheart and Todd Gearheart committed

4  perjury in claiming that the payments made from Wawasan to Dores and their role in facilitating

5  these payments did not have a business purpose.[3]

6        176.    Representatives of J.D. Heiskell attended the proceedings at which Todd Gearheart

7  and Ray Gearheart testified, assisted in the preparation of their defense, and had knowledge at the

8  time they testified at the contempt hearing that the testimony they were giving in the proceedings

9  was false.  J.D. Heiskell and its representatives remained silent in a contempt hearing in federal

10  district court while they watched their own corporate officer commit perjury.  J.D. Heiskell faced

11  a win-win situation.  There was some possibility that, through error of counsel, Plaintiffs might

12  fail to present evidence to meet their burden, or through error of the court, Defendants might

13  escape liability for their specific acts undertaken in violation of the court's orders.  Or, even if

14  J.D. Heiskell ultimately might lose on its objections, and even if J.D. Heiskell might be held

15  liable for fee shifting, J.D. Heiskell still would win by using frivolous objections to front-load

16  litigation expense and impose litigation burden and expense on Plaintiffs.

17        177.    These falsehoods were further efforts by the Defendants to conceal the nature of

18  the enterprise and further the goals of continuing to grow the enterprise.  The acts of perjury as

19  described above are crimes under 18. U.S.C. § 1621 and U.S.C. § 1503, and are predicate

20  offenses constituting "racketeering activity" under RICO, 18 U.S.C. § 1961(1).

---

[3] As noted, Magistrate Judge Austin has now issued his report and recommendation, which has been adopted by the district court.  Magistrate Judge Austin expressly addressed the credibility of the witnesses and discussed specific testimony from each witness that was incredible and inconsistent, and further noted that the respondents did not act in good-faith.  (A-57, at 8-10.)  For example, Magistrate Judge Austin found as incredible and inconsistent Dores' testimony regarding his post-resignation contacts with the Bunnett Parties' customers, his post-resignation contacts and relationships with the Gearhearts and Wawasan, his claimed purpose for his company FM Ag Enterprises, Inc., and his claimed complete lack of memory regarding the payment scheme.  Magistrate Judge Austin also found that Ray Gearheart's testimony about his contacts and relationship with Dores after resigning were incredible, as was his testimony about the purpose of the payment scheme.  Magistrate Judge Austin similarly found that Todd Gearheart's testimony regarding his claimed lack of knowledge of the court's temporary restraining order and his claimed motivation for the payments to Dores were incredible and inconsistent with the evidence.  These are each examples of further perjury by the Defendants.

**Pattern of Racketeering Activity**

178.    All of the predicate acts of racketeering activity described herein are part of the nexus of the affairs and functions of the racketeering enterprise. The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless enjoined and Defendants ordered to pay damages.  Numerous schemes have been completed involving repeated unlawful conduct that by their nature project into the future with a threat of repetition. Indeed, the Gearheart Distribution Channel is still competing with Plaintiffs and has shown that it will commit unlawful acts as a regular way of conducting its business.

179.    This propensity for further unlawful acts is shown by the elaborate methods employed to conceal their misconduct, including the use of aliases, fake names, front organizations, phony invoices, under the table payments, mislabeling product bags, and other deceitful means.  The Gearheart Distribution Channel has shown that it will take whatever steps are necessary to preserve itself, grow the business, and harm the Bunnett Parties, regardless of whether those steps are lawful.

180.    Other evidence strongly suggests that the Gearheart Distribution Channel will continue to commit unlawful acts in the ordinary course of its business.  For example, Frank Dores has now testified that he is overtly returning to the agricultural business.  The potential joint venture among J.D. Heiskell, Wawasan, and Natural Soda again presents a continuing risk. Moreover, J.D. Heiskell has shown that it will permit its officers to provide false testimony and commit perjury in an effort to protect the Gearheart Distribution Channel.  Further, J.D. Heiskell and Todd Gearheart knew about Frank Dores' phony disability claim, knew about temporary restraining orders entered against Frank Dores, knew about Frank Dores' bankruptcy case, and yet still J.D. Heiskell continued to work with Ray Gearheart and Frank Dores and had no qualms about participating in a criminal fraud in order to protect their preferred distribution channel. Further, Ray Gearheart has expanded the alternative distribution channel by hiring sales representatives from competitors, thereby attempting to expand into a broader customer base by hiring other competitors' representatives, which presents the material risk that these same tactics will be employed again.

181.    And of course, inherent in the goals of protecting supply and protecting a preferred relationship with a strategic distribution channel is the idea that these tactics will be used again when needed to maintain the channel.  As the importance and value of the channel has grown, so has its strategic benefit to the Defendants.  If and when changing market conditions or competitive conditions challenge the Defendants' market position, they will resort to the same tactics.

182.    The circumstances show that the predicate acts are part of the Gearheart Distribution Channel's way of conducting business.  Moreover, the type of conduct at issue carries a threat of repetition as illustrated by the members' continued perjury aimed at concealment.  This is sufficient to constitute an open-ended scheme.

183.    To the extent that the Gearheart Distribution Channel has been disrupted in part by this suit and other litigation brought by the Plaintiffs to enforce their legal rights or otherwise is not ongoing, the Gearheart Distribution Channel performed a series of interrelated predicates over an extended period of time beginning with commercial bribery of Frank Dores while he was still employed by the Bunnett Parties and stretching until the last known predicate act, perjury, in July 2017.  This is sufficient to constitute a close-ended scheme.

**Todd Gearheart Acted on Behalf of and For the Benefit of J.D Heiskell with J.D. Heiskell's Knowledge and Support**

184.    Todd Gearheart's acts were not the isolated misconduct of a single rogue corporate officer.  Instead, Todd Gearheart has acted for the benefit of and with the knowledge, encouragement, and support of his employer J.D. Heiskell.

185.    Todd Gearheart made no attempt to conceal from J.D. Heiskell's other executives either the scheme or any of the criminal acts committed in furtherance of the scheme.  For example, he relied on his J.D. Heiskell email account while working in his office during regular business hours to manage and operate the Gearheart Distribution Channel and to commit the criminal predicate acts alleged above, including mail and wire fraud and bankruptcy fraud.

186.    On information and belief, Todd Gearheart, from the beginning of his involvement in the scheme, acted with the actual knowledge and approval of J.D. Heiskell.  In the alternative,

THIRD AMENDED COMPLAINT

at a minimum, Todd Gearheart's conduct shows that he reasonably believed he was faithfully performing his duties for J.D. Heiskell in a manner that others at the company would approve and support, and J.D. Heiskell's subsequent corporate acts demonstrate that Todd Gearheart was correct in his belief, because J.D. approved, ratified, and encouraged his continued participation in the scheme even after such time as the Gearhearts and J.D. Heiskell were fully informed of the facts giving rise to the claims of criminal misconduct. .

187.    Even after the Bunnett Parties put J.D. Heiskell on formal written notice that Todd Gearheart had engaged in an unlawful scheme with the Wawasan Affiliates, and even after J.D. Heiskell's outside legal counsel had verified the truth of the facts asserted by the Bunnett Parties, J.D. Heiskell did not reprimand Todd Gearheart, demote him, reduce his compensation, or institute any change at all in his responsibilities.  Instead, J.D. Heiskell continued to entrust Todd Gearheart with the responsibility of managing J.D. Heiskell's relationship with the Wawasan Affiliates and Ray Gearheart without placing any restrictions on his discretion or scope of authority and without expressing any disapproval for Todd Gearheart's role in the scheme.  J.D. Heiskell did not even counsel Todd Gearheart that he should refrain from engaging in similar conduct with these same persons again in the future.

188.    J.D. Heiskell's decision to allow Todd Gearheart to continue managing the company's business relationship with the Wawasan Affiliates and Ray Gearheart without any restrictions at all and without any expression of disapproval for any part of his conduct is compelling evidence that J.D. Heiskell believed Todd Gearheart was faithfully serving the best interests of J.D. Heiskell through his participation in the scheme, that he was acting according to their mutual understanding of the proper scope of his employment, and that he should continue to pursue similar conduct in the future so long as it served the best interests of J.D. Heiskell.

189.    The conduct of Todd Gearheart, the benefits J.D. Heiskell derived from his conduct, the response of J.D. Heiskell when this conduct was publicly disclosed, and J.D. Heiskell's decision to allow Todd Gearheart to continue to manage J.D. Heiskell's relationship with the Wawasan Affiliates and Ray Gearheart all support the inference that Todd Gearheart acted with the actual, prior knowledge and approval of J.D. Heiskell.  In the alternative, J.D.

1   Heiskell ratified Todd Gearheart's conduct as acts by and for the benefit of the company when
2   J.D. Heiskell allowed Todd Gearheart to continue his role in the scheme, retained the benefits
3   already received thereby, and continued to accept the benefits of the Gearheart Distribution
4   Channel and the participants' continuing criminal acts in support of the enterprise.

5       190.    Had J.D. Heiskell been the unwitting participant in a criminal enterprise through
6   the unauthorized and *ultra vires* acts of a corporate officer, then J.D. Heiskell could have taken
7   steps to withdraw from the enterprise and to cause Todd Gearheart to withdraw or terminate his
8   employment.  Instead, J.D. Heiskell did the opposite, providing Todd Gearheart the means and
9   support to continue to participate on behalf of and for the benefit of J.D. Heiskell.

10      191.    As alleged above, the Gearhearts have a decades-long relationship with J.D.
11  Heiskell and its Chief Executive Officer, Ryan Pellett.  As explained in Paragraph 77, Ray
12  Gearheart was for many years an officer and senior executive of J.D. Heiskell and certain
13  predecessor businesses.  Todd Gearheart has spent his entire adult life working at J.D. Heiskell
14  and these same predecessor companies, beginning after high school.  The current CEO of J.D.
15  Heiskell, Ryan Pellett, was first hired by Ray Gearheart, and he worked side-by-side with Todd
16  Gearheart when he began that first job.  Todd Gearheart at all material times has reported directly
17  to Ryan Pellett as J.D. Heiskell's CEO.  Just like Todd Gearheart, Ryan Pellett had spent his
18  entire adult life working for J.D. Heiskell or its corporate predecessors.  Given their decades-long
19  relationship together and working with Ray Gearheart, and J.D. Heiskell's elevation of these two
20  men to positions of high compensation and substantial responsibility without any other credible
21  education or experience, and with J.D. Heiskell's position as the principal if not sole source of all
22  three men's prospects for present and future employment material security, it strains credulity that
23  Todd Gearheart or Ray Gearheart would withhold from Ryan Pellett any material information
24  relating to J.D. Heiskell's business.  In the alternative, to the extent that Ray and Todd Gearheart
25  did not disclose their participation in this scheme, then the Gearhearts approached JDH as part of
26  a purported wink-and-a-nod strategy in which JDH would engage in illegal misconduct with
27  Pellett's express or tacit approval in a manner calculated to insulate the company and Pellett from
28  liability through a cynical strategy of supposed willful blindness.

192.   This high level of trust between both Todd and Ray Gearheart and J.D. Heiskell is reflected in the broad discretion Todd Gearheart has been allowed in dealings with his father. Todd Gearheart is entrusted with negotiating the price and quantity terms for substantial, multi-million dollar purchases of product even though his father Ray Gearheart is the sales representative through whom the purchases are made and for which he is compensated.   On information and belief, the Gearhearts and J.D. Heiskell have had a longstanding, mutual agreement and understanding that, so long as the Gearhearts remain loyal to J.D. Heiskell and protect J.D. Heiskell's interests, then J.D. Heiskell in turn will take care of the Gearhearts.   Over many years, Ray Gearheart has used his position as a representative for distributors and manufacturers from whom J.D. Heiskell purchases products to ensure that J.D. Heiskell has the most reliable supply at the best prices, is protected from competition, and receives information about its competitors' raw material prices and supply.   And in return, J.D. Heiskell has ensured that the Gearhearts are well compensated.

193.   The specific tortious and criminal acts by which Todd Gearheart helped to create, manage, and operate the Gearheart Distribution Channel are all of the same nature and character as his other regular daily business activities on behalf of J.D. Heiskell.   In both, Todd Gearheart selects products and suppliers and distributors for those products; negotiates pricing and quantity terms; chooses product delivery dates and ports of entry; approves and transmits invoices and payments; and monitors competitive conditions and trends in the marketplace.   Todd Gearheart's co-conspirators, the Wawasan Affiliates and Ray Gearheart, are some of the same persons with whom he has regularly conducted business on behalf of J.D.  Heiskell for many years.   He has conducted both the wrongful acts and his other business activities during the same business hours in the same office using the same email account and the same telephones.   He has conducted the wrongful acts for the purpose of achieving the same business objectives that for many years have been some of his same objectives in his work for J.D. Heiskell—to enhance competitive position, reduce product acquisition cost, and gain market share.

194.   The specific predicate acts that Todd Gearheart committed in furtherance of the scheme were carried out specifically in order to establish and further the Gearheart Distribution

Channel to the benefit of J.D. Heiskell.  Todd Gearheart funneled money to Dores, committed bankruptcy fraud, and perjured himself in order to ensure the secrecy and viability of the Gearheart Distribution Channel, which provided a direct benefit to J.D. Heiskell.  The criminal nature of the predicate acts does not arise from the business means employed—which are the same as Todd Gearheart's other regular business activities—or from the type of persons with whom he dealt—who are again some of the same otherwise has dealt with for many years—or the objectives of the activities—which again are the same objectives that Todd Gearheart has long pursued for J.D. Heiskell in a range of commercial activities.  Instead, the criminal nature of Todd Gearheart's particular conduct arises from his attempts to conceal his activities and the activities of his co-conspirators from the Bunnett Parties.  As alleged above, (Paragraphs 160-62), concealment was an important factor in the planning and implementation of the Gearheart Distribution Channel and advanced the interests of J.D. Heiskell by contributing to the success of the scheme, to J.D. Heiskell's profit.

195.   Although much of the dealings between the Gearhearts and J.D. Heiskell were conducted in secret, their corrupt bargain is evidenced by J.D. Heiskell's continued dealings with Ray Gearheart without any change in their relationship and without any attempt to monitor or limit Todd Gearheart's scope of authority and discretion in conducting business on behalf of J.D. Heiskell with his father or with the Wawasan Affiliates, even after the Bunnett Parties had first disclosed to J.D. Heiskell and then publicly disclosed a substantial part of the conduct at issue. Even putting to one side the information that J.D. Heiskell received from the Gearhearts, from the Wawasan Affiliates, and from Natural Soda, J.D. Heiskell repeatedly was placed on notice by information received from the Bunnett Parties and from multiple other sources that Ray Gearheart and Todd Gearheart were engaged in misconduct, and yet J.D. Heiskell's only response to the situation was to allow the Gearhearts the same broad scope of authority and resources to advance J.D. Heiskell's business interests through their wrongful conduct.

196.   The first such notice to J.D. Heiskell occurred not later than October 31, 2015, when Bill Bunnett forwarded to another executive at J.D. Heiskell an email in which Todd Gearheart accused Energy Feeds of arbitrarily "cutting off"  (Ex. A-15.) J.D. Heiskell's supply of

product.  The J.D. Heiskell executive, Rick Bowen, to whom Bill Bunnett forwarded the email knew that Todd Gearheart's statement was false because of that executive's own involvement in the business dealings between the parties.  "Cutting off" a customer is a serious allegation of unethical and punitive business practices.  As noted, Todd Gearheart falsely spread disparaging rumors about the Bunnett Parties to other market participants, including the false claim that the Bunnett Parties had "cut off" J.D. Heiskell.  At the time that Todd Gearheart was spreading the false "cutting off" rumor, J.D. Heiskell's other executives were aware that the rumor was false and yet allowed Todd Gearheart to proceed.

197.    Second, Todd Gearheart received an email on November 26, 2015 with a copy of the November 24, 2015 temporary restraining order entered against Frank Dores and a copy of the Bunnett Parties' complaint against Frank Dores alleging breach of fiduciary duty and misappropriation of trade secrets.  Todd Gearheart then forwarded this email to others at J.D. Heiskell, including the same executive, Rick Bowen, to whom Bill Bunnett had forwarded the "cutting off" email.  (Ex. A-59.)  That was at least the second notice to J.D. Heiskell because of the detailed allegations contained in that complaint describing the misconduct surrounding the Former Representatives' resignations.  According to the email chain, J.D. Heiskell responded to the Bunnett Parties' petition by looking for a copy of the confidentiality agreement with Energy Feeds that forms part of the subject matter of this suit.  (*See id.*)

198.    The third notice to J.D. Heiskell occurred in January 2016 when JJ Bunnett told J.D. Heiskell executives that Bunnett & Company had obtained a temporary restraining order against Natural Soda requiring that Natural Soda honor Bunnett & Company's exclusive sales territory.  The dispute with Natural Soda further highlighted that Ray Gearheart and the other Former Representatives' resignations from the Bunnett Parties appeared to be implicated in serious wrongdoing.

199.    The fourth notice occurred when the Bunnett Parties served J.D. Heiskell with a subpoena requesting production of documents in June 2016.   The subpoena contained a description and attachments showing Todd Gearheart's participation in the illicit January and March 2016 payments.  J.D. Heiskell, through its outside counsel, produced in response to the

1    subpoena additional documents from Todd Gearheart's J.D. Heiskell email account relating to the

2    illicit payments and the surrounding circumstances.

3        200.    Fifth, at the corporate representative deposition in connection with this subpoena,

4    Rick Bowen of J.D. Heiskell testified that J.D. Heiskell with the assistance of counsel had

5    inquired into the circumstances surrounding the illicit payments and the surrounding

6    circumstances.  Todd Gearheart was also deposed.  Corporate representatives for J.D. Heiskell

7    and outside counsel for J.D. Heiskell attended both of these depositions.  At those depositions,

8    there was testimony that Todd Gearheart had never been disciplined or reprimanded, that no one

9    at J.D. Heiskell had even expressed disapproval of Todd Gearheart's actions, and that there had

10    been no change in Todd Gearheart's duties or restrictions imposed on Todd Gearheart.

11        201.    Finally, J.D. Heiskell was well aware of the contempt proceedings that the Bunnett

12    Parties filed against Todd Gearheart, Ray Gearheart, and Frank Dores in September 2016.  The

13    Bunnett Parties' contempt motion contained detailed factual allegations and supporting evidence.

14    As described elsewhere, the district court found each of these persons in contempt of court.

15        202.    In addition to these numerous instances by which the Bunnett Parties placed J.D.

16    Heiskell on notice of the facts as they became known to the Bunnett Parties, on information and

17    belief Todd Gearheart and Ray Gearheart did in fact actually keep J.D. Heiskell fully informed at

18    all times of their activities.  For example, J.D. Heiskell has admitted in deposition testimony in

19    other proceedings that Todd Gearheart met with the other officers of J.D. Heiskell in October or

20    November 2015 and discussed at that meeting his father's resignation and the other Former

21    Representatives' resignations from the Bunnett Parties, how and from whom J.D. Heiskell should

22    obtain product in the future, whether Ray Gearheart should formally rejoin J.D. Heiskell as an

23    employee, and Ray Gearheart's alternatives for employment.  The executives who attended this

24    meeting included the same executives to whom Todd Gearheart that same month forwarded the

25    complaint and temporary restraining order in the Bunnett Parties' first lawsuit against Frank

26    Dores, the same email that prompted J.D. Heiskell to search for the confidentiality agreement it

27    had signed with the Bunnett Parties.  It strains credulity that Todd Gearheart revealed nothing at

28

1  this meeting about his and his father's efforts to advance J.D. Heiskell's interests by working with

2  the Wawasan Affiliates to create the Gearheart Distribution Channel.

3         203.   J.D. Heiskell benefited substantially from the Gearhearts' tortious and criminal

4  acts, including by purchasing directly from the Bunnett Parties' former exclusive suppliers,

5  obtaining product at lower prices and thereby increasing its own profit margins, expanding its

6  market share, and severely weakening the Bunnett Parties as competitors.  Indeed, at the contempt

7  trial in July 2017, Ray Gearheart and Todd Gearheart testified that it was very important for J.D.

8  Heiskell to maintain a secure supply of inert fats supplied by Wawasan. Ray Gearheart admitted

9  that if he had not participated in the scheme with Wawasan, he believed that an interruption of

10  supply from Wawasan to J.D. Heiskell might have been the result. (Ex. A-56, at 21.)  Moreover,

11  before the events giving rise to this litigation, J.D. Heiskell wanted to buy direct from the

12  manufacturers, Natural Soda and Wawasan, and J.D. Heiskell accomplished this goal through the

13  Gearheart Distribution Channel.  Further showing the substantial benefits to J.D. Heiskell, is the

14  fact that J.D. Heiskell achieved through the Gearheart Distribution Channel an informal business

15  combination with Wawasan.   As noted above, J.D. Heiskell desired a formal business

16  combination with Wawasan, but those formal negotiations were put on hold until resolution of the

17  Bunnett litigation.

18         204.   A reasonable inference can therefore be drawn that, on information and belief,

19  Todd Gearheart also sent the January TRO to other J.D. Heiskell executives and told them about

20  the illicit January and March 2016 payments at the time they were made.  From the close personal

21  relationship between the Gearhearts and Ryan Pellett, the knowledge that Todd Gearheart

22  previously shared with other officers at J.D. Heiskell, and the substantial benefits to J.D. Heiskell

23  derived from the Gearheart Distribution Channel, it is reasonable to conclude that Todd Gearheart

24  orchestrated the January and March 2016 payments in concert with J.D. Heiskell, or at a

25  minimum that Todd Gearheart told other J.D. Heiskell officers about the payments and their

26  purpose at the time they were made.

27

28

205.   In short, J.D. Heiskell has fully endorsed, supported, approved and ratified Todd Gearheart's unlawful acts and currently enjoys the continuing benefits of those acts while attempting to shield itself from responsibility for those same acts.

**Injury**

206.   Plaintiffs Bunnett & Company and Energy Feeds sustained injury to their business by reason of the Gearheart Distribution Channel's individual predicate acts and their pattern of racketeering activity.   As a direct and proximate result of these violations of Title 18 United States Code § 1962 (c), Plaintiffs have been injured in their business or property and suffered substantial damages in the form of lost customers, profits, enterprise value, goodwill, and business opportunities. Furthermore, the Defendants have been able to gain a competitive advantage over Plaintiffs by operating and/or conducting the affairs of the enterprise and/or participating in the racketeering activity.   Furthermore, the individual predicates acts and the scheme as a whole caused harm to the Plaintiffs by way of unnecessary attorneys' fees, delayed legal relief, and causing other litigation and the attendant attorneys' fees and expenses.

207.   Indeed, the misconduct and unlawful acts that the Defendants undertook were part of a scheme that had as its principal objective establishing and maintaining a new competing distribution channel.   Defendants desired to displace the Plaintiffs, interfere with and misappropriate the Plaintiffs' customer relationships, conceal their misconduct thereby preventing the Plaintiffs from enforcing their legal rights, and then use that customer and supplier base to drive the Bunnett Parties out of business.

**Damages**

208.   Defendants are liable to for treble damages, together with all costs of this action, plus reasonable attorney's fees, as provided under Title 18 United States Code section 1964(c). Damages are mandatorily trebled under civil RICO.   Defendants are jointly and severally liable for all acts of their coconspirators as a matter of law.   Further, contribution and indemnification claims are not available for civil RICO claims.

**COUNT TWO**
**Violations of the Racketeer Influenced and Corrupt**
**Organizations Act ("RICO")**
**18 U.S.C. § 1962(d)**
*All Plaintiffs v. All Defendants*

209.    Plaintiffs hereby re-allege and incorporate by reference herein, as if set forth in full, the allegations set forth above in all paragraphs.

210.    As set forth above, in violation of 18 U.S.C. § 1962(d), Defendants reached an illicit agreement to violate the provisions of 18 U.S.C. § 1962(c).

211.    Defendants willfully combined, conspired, and agreed with one another and with others to violate Title 18, United States Code, Section 1962(c), that is, to conduct and/or to participate, directly or indirectly, in the affairs of the Gearheart Distribution Channel, the activities of which were conducted through a pattern of racketeering activities, in violation of U.S.C. section 1962(d).

212.    The object of this conspiracy was to establish a new distribution channel and maintain that distribution channel through any means necessary, including interfering with the Bunnett Parties' customer and supplier relationships and engaging in the misconduct herein alleged.

213.    J.D. Heiskell was a member of this conspiracy because, on information and belief, it agreed with Todd Gearheart and the other Defendants to violate Title 18, United States Code, Section 1962(c), that is, to conduct and/or to participate, directly or indirectly, in the affairs of the Gearheart Distribution Channel, the activities of which were conducted through a pattern of racketeering activities, in violation of U.S.C. section 1962(d).  J.D. Heiskell was also a member of this conspiracy because it is vicariously liable for the actions of its vice president, Todd Gearheart, or because the acts of Todd Gearheart as a corporate officer should be imputed to the company as the company's own acts.

214.    Two or more Defendants agreed to commit substantive RICO offenses, and each Defendant knew of and agreed to the overall objective of the RICO offense, as set forth in Count I.

215.    As a direct and proximate result, Plaintiffs have been injured in their business or property by the predicate acts that make up the enterprise's patterns of racketeering activity in that Plaintiffs have lost customers and business opportunities.

216.    Defendants are liable to for treble damages, together with all costs of this action, plus reasonable attorney's fees.  Damages are mandatorily trebled under civil RICO.  Defendants are jointly and severally liable for all acts of their coconspirators as a matter of law.  Further, contribution and indemnification claims are not available for civil RICO claims.

**COUNT THREE**
**Violations of the Robinson-Patman Act**
**15. U.S.C. § 13(c)**
*Energy Feeds v. Frank Dores*

217.    Plaintiff Energy Feeds hereby re-alleges and incorporates by reference herein, as if set forth in full, the allegations set forth above in all paragraphs.

218.    In Frank Dores' role as General Manager, he managed the purchasing decisions for Plaintiff Energy Feeds.  Frank Dores selected the quantities of product to purchase and negotiated with suppliers on the price of those products.

219.    As detailed above, Plaintiffs already have obtained bank records and other evidence demonstrating that Wawasan's affiliate, Paros, made at least one disguised payments to Frank Dores in November 2015.   Paros made similar payments to Ray Gearheart and Franklin over a period of several months. On information and belief, Wawasan or Paros at Wawasan's behest actually began making payments to Frank Dores earlier than November 2015, while Dores still was employed with the Bunnett Parties.  On information and belief, these payments had multiple purposes, one of which was to cause Frank Dores to place orders for product that were disadvantageous to Energy Feeds.  Wawasan made these payments because it knew that Frank Dores was in a position to influence the buyer's, i.e. Energy Feeds', purchasing decisions.

220.    Wawasan was aware that Frank Dores, as the General Manager of Energy Feeds, owed fiduciary duties to Energy Feeds.  On information and belief, Wawasan bribed Frank Dores to wrongly influence the buyer's, i.e. Energy Feeds', purchasing decisions.  Wawasan concealed these payments from the Plaintiffs.  Frank Dores retained these benefits for his own personal

benefit and for the benefit of Wawasan.   In this manner, Wawasan corrupted the fiduciary relationship between Frank Dores and Energy Feeds.

221.    Wawasan therefore caused Energy Feeds to purchase product at a higher price that others were paying thereby resulting in competitive injury.   The result of this conduct is a decrease in competition for inert fats product because Energy Feeds has been unable to compete effectively for some customers.

222.    The commercial bribery in connection with the sale of products in interstate commerce involving Wawasan and Frank Dores is a *per se* violation of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), thereby entitling Plaintiff Energy Feeds to recover treble damages, the cost of suit, and reasonable attorneys' fees pursuant to statute, 15 U.S.C. § 15(a). Damages are mandatorily trebled under the Robinson-Patman Act.

**COUNT FOUR**
**Breach of Fiduciary Duty**
*All Plaintiffs v. Frank Dores*

223.    Plaintiffs hereby re-allege and incorporate by reference herein, as if set forth in full, the allegations set forth above in all paragraphs.

224.    As a result of his employment responsibilities and position of trust, Frank Dores owed a strict fiduciary obligation of loyalty to Bunnett & Company and Energy Feeds.  Dores' duty of loyalty included, *inter alia*, a duty not to intentionally cause financial damages to Plaintiffs, steal Plaintiffs' confidential information or trade secrets, usurp Plaintiffs' business opportunities, and interfere with Plaintiffs' supplier and customer relationships for his own and Defendants' personal gain.

225.    Frank Dores breached his fiduciary duty through the wrongful acts described above, including but not limited to, participating in the corrupt bargain to set up an alternative distribution channel to compete with Plaintiffs' businesses, organizing the mass resignation of the Former Representatives, reaching an agreement with J.D. Heiskell before he resigned, and soliciting Plaintiffs' customers while he was still employed by and occupying a position of

confidence at Plaintiffs.  Frank Dores therefore placed his own personal interest over the interest owed to his fiduciaries.

226.   As a direct and proximate result Dores' breach of fiduciary duty and the Defendants' aiding and abetting of that breach, Plaintiffs have been harmed and have suffered damages.  Frank Dores is liable for the lost profits and other harm caused to Plaintiffs, including lost profit damages resulting from Wawasan's and Natural Soda's termination of their distribution agreements with Energy Feeds and Bunnett & Company, respectively, and Plaintiffs' lost enterprise value.

227.   Defendants are also liable for attorneys' fees from this proceeding and others necessitated by Frank Dores' breach of fiduciary duty, including attorneys' fees from the suit pending in the United States District Court for the Western District of Texas, 15-cv-1104, attorneys' fees from Frank Dores' dismissed bankruptcy case formerly before the United States Bankruptcy Court for the Eastern District of California, 16-bk-10169, attorneys' fees from Plaintiff Energy Feeds' now resolved Singapore arbitration against Wawasan, and attorneys' fees from Plaintiffs' suit against Natural Soda et al, D-1-GN-15-5653, currently pending in Travis County, Texas.

228.   Plaintiffs are entitled to exemplary damages because Frank Dores' conduct was committed with malice and oppression.

229.   Defendants are jointly and severally liable because they acted intentionally, in concert, and produced an indivisible harm.

## COUNT FIVE
### Aiding and Abetting Breach of Fiduciary Duty (Frank Dores)
*All Plaintiffs v. J.D. Heiskell, Todd Gearheart, E&K Ag, Ray Gearheart, and Gearheart AG*

230.   Plaintiffs hereby re-allege and incorporate by reference herein, as if set forth in full, the allegations set forth above in all paragraphs.

231.   As a result of his employment responsibilities and position of trust, Frank Dores owed a strict fiduciary obligation of loyalty to Bunnett & Company and Energy Feeds.

232.   Defendants J.D. Heiskell, Todd Gearheart, E&K Ag, Ray Gearheart, and Gearheart AG, were well aware that Frank Dores owed fiduciary duties to Bunnett & Company and Energy Feeds.

233.   Frank Dores breached his fiduciary duty through the wrongful acts described above, including but not limited to, participating in the corrupt bargain to set up an alternative distribution channel to compete with Plaintiffs' businesses, organizing the mass resignation of the Former Representatives, reaching a prior agreement to distribute Wawasan product and sabotage Plaintiffs, soliciting Plaintiffs' customers while he was still employed by and occupying a position of confidence at Plaintiffs, and entering into an agreement to represent Natural Soda LLC before he resigned.  Frank Dores therefore placed his own personal interest over the interest owed to his fiduciaries, Bunnett & Company and Energy Feeds.

234.   These Defendants engendered and substantially assisted Dores' breach of fiduciary duty through the conduct described above.  These Defendants engaged in this conduct in order to advance their own financial and personal interests.

235.   The deterioration of the relationship between Bunnett & Company and Natural Soda partially caused by Dores and Defendants created a perception of turmoil, negatively impacted Bunnett & Company's ability to deliver product, and harmed Plaintiffs' reputations. Defendants' knowing participation in Frank Dores' breach of fiduciary duty caused substantial harm to Bunnett & Company.  Because Energy Feeds and Bunnett & Company share many of the same customers, any harm to Bunnett & Company's customer relationships foreseeably caused harm to Energy Feeds' customer relationships and vice versa.   On information and belief, Defendants intentionally sought to harm both Energy Feeds and Bunnett & Company, in an effort to injure Plaintiffs' customer goodwill and business reputation and thereby gain an unfair competitive advantage.

236.   As a direct and proximate result Dores' breach of fiduciary duty and the Defendants' aiding and abetting of that breach, Plaintiffs have been harmed and have suffered damages.  Defendants are liable for the lost profits and other harm caused to Plaintiffs, including lost profit damages resulting from Wawasan's and Natural Soda's termination of their distribution

agreements with Energy Feeds and Bunnett & Company, respectively, and Plaintiffs' lost enterprise value. Further, these Defendants have wrongfully obtained money or property through their knowing participation in Dores' breach of fiduciary duty and have profited substantially thereby. Plaintiffs are therefore entitled to recover Defendants' ill-gotten gains.

237.    Defendants are also liable for attorneys' fees from this proceeding and others necessitated by Frank Dores' breach of fiduciary duty, including attorneys' fees from the suit pending in the United States District Court for the Western District of Texas, 15-cv-1104, attorneys' fees from Frank Dores' dismissed bankruptcy case formerly before the United States Bankruptcy Court for the Eastern District of California, 16-bk-10169, attorneys' fees from Plaintiff Energy Feeds' now resolved Singapore arbitration against Wawasan, and attorneys' fees from Plaintiffs' suit against Natural Soda et al, D-1-GN-15-5653, currently pending in Travis County, Texas.

238.    Plaintiffs are entitled to exemplary damages because Defendants' conduct was committed with malice and oppression.

239.    Defendants are jointly and severally liable because they acted intentionally, in concert, and produced an indivisible harm.

## COUNT SIX
### Breach of Fiduciary Duty
#### *All Plaintiffs v. Ray Gearheart*

240.    Plaintiffs hereby re-allege and incorporate by reference herein, as if set forth in full, the allegations set forth above in all paragraphs.

241.    As a result of his agency relationship, responsibilities, and position of trust, Ray Gearheart owed attendant fiduciary duties, including the duty of loyalty to his principals, Bunnett & Company and Energy Feeds.  Ray Gearhearts' duty of loyalty included, *inter alia*, a duty not to intentionally cause financial damages to Plaintiffs, steal Plaintiffs' confidential information or trade secrets, usurp Plaintiffs' business opportunities, and interfere with Plaintiffs' supplier and customer relationships for his own and Defendants' personal gain.

242.   Ray Gearheart breached his fiduciary duty through the wrongful acts described above, including but not limited to, participating in the corrupt bargain to set up an alternative distribution channel to compete with Plaintiffs' businesses, participating in the mass resignation of the Former Representatives, reaching an agreement with J.D. Heiskell before he resigned, and soliciting Plaintiffs' customers while he was still an agent of Plaintiffs.  The most direct breach of his fiduciary duty was "double dealing," by purportedly negotiating on behalf of the Bunnett Parties for the sale of product to J.D. Heiskell, while simultaneously placing orders for J.D. Heiskell with the new, competing distribution channel. Ray Gearheart therefore placed his own personal interest over the interest owed to his principals.

243.   As a direct and proximate result Ray Gearheart's breach of fiduciary duty and the Defendants' aiding and abetting of that breach, Plaintiffs have been harmed and have suffered damages.  Defendants are liable for the lost profits and other harm caused to Plaintiffs, including lost profit damages resulting from Wawasan's and Natural Soda's termination of their distribution agreements with Energy Feeds and Bunnett & Company, respectively, and Plaintiffs' lost enterprise value. Further, these Defendants have wrongfully obtained money or property through their knowing participation in Ray Gearheart's breach of fiduciary duty and have profited substantially thereby. Plaintiffs are therefore entitled to recover Defendants' ill-gotten gains.

244.   Defendants are also liable for attorneys' fees from this proceeding and others necessitated by Ray Gearheart's breach of fiduciary duty, including attorneys' fees from the suit pending in the United States District Court for the Western District of Texas, 15-cv-1104, attorneys' fees from Frank Dores' dismissed bankruptcy case formerly before the United States Bankruptcy Court for the Eastern District of California, 16-bk-10169, attorneys' fees from Plaintiff Energy Feeds' now resolved Singapore arbitration against Wawasan, and attorneys' fees from Plaintiffs' suit against Natural Soda et al, D-1-GN-15-5653, currently pending in Travis County, Texas.

245.   Plaintiffs are entitled to exemplary damages because Defendants' conduct was committed with malice and oppression.

246.   Defendants are jointly and severally liable because they acted intentionally, in concert, and produced an indivisible harm.

## COUNT SEVEN

**Aiding and Abetting Breach of Fiduciary Duty (Ray Gearheart)**
*All Plaintiffs v. J.D. Heiskell, Todd Gearheart, E&K Ag, and Frank Dores*

247.   Plaintiffs hereby re-allege and incorporate by reference herein, as if set forth in full, the allegations set forth above in all paragraphs.

248.   As a result of his agency relationship and position of trust, Ray Gearheart owed attendant fiduciary obligations, including a duty of loyalty, to Bunnett & Company and Energy Feeds.

249.   Defendants J.D. Heiskell, Todd Gearheart, E&K Ag, and Frank Dores, were well aware that Ray Gearheart owed fiduciary duties to Bunnett & Company and Energy Feeds.

250.   Ray Gearheart breached his fiduciary duty through the wrongful acts described above, including but not limited to, participating in the corrupt bargain to set up an alternative distribution channel to compete with Plaintiffs' businesses, participating in the mass resignation of the Former Representatives, reaching an agreement with J.D. Heiskell before he resigned, and soliciting Plaintiffs' customers while he was still an agent of Plaintiffs.  The most direct breach of his fiduciary duty was "double dealing," by purportedly negotiating on behalf of the Bunnett Parties for the sale of product to J.D. Heiskell, while simultaneously placing orders for J.D. Heiskell with the new, competing distribution channel. Ray Gearheart therefore placed his own personal interest over the interest owed to his principals.

251.   These Defendants engendered and substantially assisted Ray Gearheart's breach of fiduciary duty through the conduct described above.  These Defendants engaged in this conduct in order to advance their own financial and personal interests.

252.   The deterioration of the relationship between Bunnett & Company and Natural Soda partially caused by Ray Gearheart and Defendants created a perception of turmoil, negatively impacted Bunnett & Company's ability to deliver product, and harmed Plaintiffs'

reputations.  Defendants' knowing participation in Ray Gearheart's breach of fiduciary duty caused substantial harm to Bunnett & Company.  Because Energy Feeds and Bunnett & Company share many of the same customers, any harm to Bunnett & Company's customer relationships foreseeably caused harm to Energy Feeds' customer relationships and vice versa.  On information and belief, Defendants intentionally sought to harm both Energy Feeds and Bunnett & Company, in an effort to injure Plaintiffs' customer goodwill and business reputation and thereby gain an unfair competitive advantage.

253.    As a direct and proximate result Ray Gearheart's breach of fiduciary duty and the Defendants' aiding and abetting of that breach, Plaintiffs have been harmed and have suffered damages.  Defendants are liable for the lost profits and other harm caused to Plaintiffs, including lost profit damages resulting from Wawasan's and Natural Soda's termination of their distribution agreements with Energy Feeds and Bunnett & Company, respectively, and Plaintiffs' lost enterprise value. Further, these Defendants have wrongfully obtained money or property through their knowing participation in Ray Gearheart's breach of fiduciary duty and have profited substantially thereby. Plaintiffs are therefore entitled to recover Defendants' ill-gotten gains.

254.    Defendants are also liable for attorneys' fees from this proceeding and others necessitated by Frank Dores' breach of fiduciary duty, including attorneys' fees from the suit pending in the United States District Court for the Western District of Texas, 15-cv-1104, attorneys' fees from Frank Dores' dismissed bankruptcy case formerly before the United States Bankruptcy Court for the Eastern District of California, 16-bk-10169, attorneys' fees from Plaintiff Energy Feeds' now resolved Singapore arbitration against Wawasan, and attorneys' fees from Plaintiffs' suit against Natural Soda et al, D-1-GN-15-5653, currently pending in Travis County, Texas.

255.    Plaintiffs are entitled to exemplary damages because Frank Dores' conduct was committed with malice and oppression.

256.    Defendants are jointly and severally liable because they acted intentionally, in concert, and produced an indivisible harm.

## COUNT EIGHT

**Inducing Breach of Contract (Supplier Agreement with Natural Soda)**
*Bunnett & Company v. All Defendants*

257.    Plaintiff Bunnett & Company hereby re-alleges and incorporates by reference herein, as if set forth in full, the allegations set forth above in all paragraphs.

258.    Plaintiff Bunnett & Company and Natural Soda were parties to the Natural Soda EDA.

259.    Defendants were aware of the Natural Soda EDA.

260.    Defendants undertook intentional acts designed to induce Natural Soda to breach and terminate the Natural Soda EDA.

261.    Without admitting that such proof is required for Bunnett & Company to prevail, Bunnett & Company further alleges that Defendants used independently wrongful means to induce Natural Soda to breach and then to terminate the Natural Soda EDA.

262.    Defendants' conduct was a substantial cause in Natural Soda breaching and wrongfully terminating the Natural Soda EDA.

263.    Plaintiff Bunnett & Company suffered damages because of Natural Soda's breach and wrongful termination.  Defendants' conduct was a substantial factor in causing Bunnett & Company's harm, which includes lost profits, reputational harm, and a loss in enterprise value.

264.    Defendants are liable for one or more of the following as a result of their misconduct: Plaintiffs' lost profit damages, Plaintiffs' lost enterprise value, and/or Defendants' ill-gotten gains.

265.    Defendants are also liable for attorneys' fees from Plaintiffs' suit against Natural Soda et al, D-1-GN-15-5653, currently pending in Travis County, Texas, in which Bunnett & Company sought relief for Natural Soda's breach and termination.

266.    Plaintiffs are entitled to exemplary damages because Defendants conduct was committed with malice and oppression.

267.    Defendants are jointly and severally liable because they acted intentionally, in concert, and produced an indivisible harm.

## COUNT NINE
**Inducing Breach of Contract (Supplier Agreement with Wawasan)**
*Energy Feeds v. All Defendants*

268.     Plaintiff Energy Feeds hereby re-alleges and incorporates by reference herein, as if set forth in full, the allegations set forth above in all paragraphs.

269.     Plaintiff Energy Feeds had a contract with Wawasan, the Wawasan EDA.

270.     Defendants J.D. Heiskell, Todd Gearheart, E&K Ag, Frank Dores, Ray Gearheart, and Gearheart AG, were aware of the Wawasan EDA.

271.     Defendants undertook intentional acts designed to induce Wawasan to breach the Wawasan EDA by dealing with J.D. Heiskell in violation of Energy Feeds' exclusive distribution rights, including by reaching an agreement and then placing orders with Wawasan in breach of the Wawasan EDA.

272.     Defendants undertook intentional acts designed to induce Wawasan to terminate the Wawasan EDA.

273.     Without admitting that such proof is required for Energy Feeds to prevail, Energy Feeds further alleges that Defendants used independently wrongful means to induce Wawasan to breach and then to terminate Wawasan EDA.

274.     Defendants conduct was a substantial cause in Wawasan first breaching and then in terminating the Wawasan EDA.

275.     Plaintiff Energy Feeds suffered damages because of Wawasan's breaches and termination of the Wawasan EDA.  These Defendants' conduct was a substantial factor in causing Energy Feeds' harm, which includes lost profits, reputational harm, and a loss in enterprise value.

276.      Defendants are also liable for attorneys' fees from Energy Feeds now resolved Singapore arbitration against Wawasan, in which Energy Feeds sought relief for Wawasan's breaches and termination.

277.     Plaintiffs are entitled to exemplary damages because Defendants conduct was committed with malice and oppression.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

THIRD AMENDED COMPLAINT

278.    Defendants are jointly and severally liable because they acted intentionally, in concert, and produced an indivisible harm.

## COUNT TEN
### Breach of Contract
*Energy Feeds v. J.D. Heiskell*

279.    Plaintiff Energy Feeds re-alleges and incorporates by reference herein, as if set forth in full, the allegations set forth above in all paragraphs.

280.    The Confidentiality Agreement between Energy Feeds and J.D. Heiskell is a valid, enforceable contract.

281.    Plaintiff Energy Feeds fully performed its obligations under the Confidentiality Agreement or has been excused from performance.

282.    On information and belief, J.D. Heiskell breached the Agreement by disclosing Confidential Information, as defined in the Confidentiality Agreement, to third parties, including Wawasan and Wawasan's Gareth Cheong and Yap Wai Joon.  J.D. Heiskell had significant financial motivation to share this information with Wawasan, Gareth Cheong, and Yap Wai Joon in order to increase its own market position and encourage Wawasan to enter into a relationship with J.D. Heiskell.  On information and belief, J.D. Heiskell further misused Confidential Information in its efforts to establish a competing distribution channel.

283.    As a direct result of J.D. Heiskell's breaches, Energy Feeds has suffered damages and will continue to suffer damages in an amount to be proven at trial.

## COUNT ELEVEN
### Violations of the California Unfair Competition Law
### California Business and Professions Code §17200 *et seq.*
*All Plaintiffs v. All Defendants*

284.    Plaintiffs hereby re-allege and incorporate by reference herein, as if set forth in full, the allegations set forth above in all paragraphs.

285.    California Business and Professions Code § 17200 prohibits "any unlawful, unfair or fraudulent business act or practice." For the reasons described above, Defendants have engaged

in unlawful, unfair, or fraudulent business acts or practices in violation of California Business and Professions Code §§ 17200 *et seq.*

286.    Defendants engaged in unlawful business practices by setting up an alternative distribution channel and attempting to destroy Plaintiffs' businesses through patterns of illegal racketeering activity that caused injury to Plaintiffs' business and property in the form of lost customers, lost business opportunities, lost revenues, and lost profits.

287.    J.D. Heiskell and Todd Gearheart engaged in unlawful business practices by commercially disparaging Plaintiffs and tortuously interfering with Plaintiffs' prospective economic relations, thereby causing injury to Plaintiffs' business and property in the form of lost customers, lost business opportunities, lost revenues, and lost profits.

288.    Defendants engaged in unlawful business practices by setting up an alternative distribution channel and attempting to destroy Plaintiffs' businesses by acting in concert with Dores to violate temporary restraining orders by soliciting and selling to Plaintiffs' customers, thereby causing injury to Plaintiffs' business and property in the form of lost customers, lost business opportunities, lost revenues, and lost profits.

289.    Defendants have engaged in unlawful, unfair, and fraudulent business acts entitling Plaintiffs to judgment and equitable relief against Defendants, as set forth in the Prayer for Relief.

290.    Pursuant to Business and Professions Code § 17203, Plaintiffs seek an order requiring Defendants to immediately cease such acts of unlawful, unfair, and fraudulent business practices, and requiring them to correct their actions.

291.    Plaintiffs further seek an award of their costs and reasonable attorneys' fees incurred.

## **JURY DEMAND**

Plaintiffs request a jury trial and tender the appropriate fee with this petition.

## **PRAYER FOR RELIEF**

Plaintiffs request the Court to enter judgment against Defendants, as follows:

1. Awarding Plaintiffs compensatory, special, and treble damages as determined by the trier of fact;

2. Awarding restitution and disgorgement of Defendants' revenues or profits to Plaintiffs as determined by the trier of fact;

3. Awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendants from continuing the unlawful practices as set forth herein.

4. Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action;

5. Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of other actions caused by the Defendants' misconduct; and

6. For such other and further relief as the Court deems just and proper.

1   Dated:  April 2, 2018                           Schiff Hardin LLP

2

3                                                    By: */s/ Matthew F. Prewitt*
                                                        Jean-Paul P. Cart
4                                                       Schiff Hardin LLP
                                                        Jean-Paul P. Cart (SBN 267516)
5                                                       jcart@schiffhardin.com
                                                        One Market
6                                                       Spear Street Tower, Suite 3100
                                                        San Francisco, CA  94105
7                                                       Telephone: 415.901.8700
                                                        Facsimile:   415.901.8701
8
                                                        Schiff Hardin LLP
9                                                       Matthew F. Prewitt (*PHV*)
                                                        mprewitt@schiffhardin.com
10                                                      Michael K. Molzberger (*PHV*)
                                                        mmolzberger@schiffhardin.com
11                                                      233 S Wacker Drive, Suite 7100
                                                        Chicago, IL 60606
12                                                      Telephone: 312-258-5500

13                                                      Attorneys for Plaintiffs
                                                        BUNNETT & COMPANY, INC. and
14                                                      ENERGY FEEDS INTERNATIONAL, LLC

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

On the date of the filing of the foregoing document, as reflected on the header inserted by the court's ECF/PACER system, a true and correct copy of it is being served upon each attorney of record in the above-captioned matter; ant the original upon the Clerk of Court by way of the court's ECF/PACER system.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: April 2, 2018            */s/ Michael K. Molzberger*
                               Michael K. Molzberger